Edgar v. The Galveston City Company.

ALEXANDER EDGAR v. THE GALVESTON CITY COMPANY.

Settlement under the Colonization Laws gave no absolute right, but only a preference in favor of the settler where all other things were equal.

It seems that a settlement and improvement made upon vacant land after the Declaration of Independence, is not within the scope of the provision of the Constitution, giving to the actual settler and occupant of the soil the right to locate his land so as to include his improvement.

If within the six months' preference given to the holders of the first class land certificates such holders did not exercise their preferred right, and secure their improvement, such preference was lost, and the land open to general location.

The right of an occupant to have the benefit of his improvement, as against other individual claimants, cannot deprive the Government of the right to sell or grant the land to another, or to reserve it from location altogether.

Under an allegation that the defendant had by fraudulent means obtained possession of his certificate, and had the same surveyed and patented, without any prayer for damages for the conversion of his certificate, or that the land embraced in the patent should be held in trust for him, or generally for its restoration to him, the plaintiff is not entitled to relief in respect to the property, or possession of said certificate, or the land appropriated by it.

Appeal from Liberty. Tried below before Hon. C. W. Buckley.

Suit for a league of land. The plaintiff's petition set up as the foundation of his right to recover, the following alle-- gations :

The amended petition, after the proper averments as to par-- ties, and a recital of the previous proceedings in the cause, makes the following allegations :

1st. That Edgar immigrated to Texas with his family in April, 1835, settled in Austin's Colony, was duly received as a colonist, and so became entitled to a headright league of land within the limits of that colony.

2d. That he continued to reside in Texas, and performed all the duties of a citizen, down to the time of instituting this suit, May 2d, 1842 ; and that he was a citizen at the date of the Declaration of Independence.

3d. That in April, 1836, he selected and settled on the league now in controversy, viz : the league on the east end of Gal- veston Island, which was then vacant, and that he made im- provements on the land.

4th. That his headright certificate for a league of land was issued to petitioner in accordance with law, on the 3d day of February, 1838, by the Board of Land Commissioners of Har-- risburg county, in which county the land then was situated.

5th. That the county of Galveston was established on May 15, 1838, and this league was embraced within the new county.

6th. That petitioner filed his certificate in the office of the Surveyor of Galveston county on July 8th, 1839, together with his written application and direction for the survey of this league, including his improvements.

7th. That the certificate and application remained on file in the Surveyor's office until May 29th, 1840, but, for some rea- son unknown to petitioner, no survey was made, though often applied for :—" that on or about the 29th day of May afore- said, the said defendants combining and confederating with one Gail Borden, jr., then their pretended agent in that behalf, and with divers other persons whose names are unknown to

your petitioner, but when discovered he prays may be inserted herein with apt words to charge them as defendants hereto, how to injure and defraud your petitioner in the premises, under color of certain false and fraudulent assignments or conveyances, and by divers other fraudulent means and pretences, did, without the knowledge, consent, authority or license of your petitioner, obtain and get into their possession the aforesaid headright certificate of your petitioner, and did afterwards fraudulently convert the same to their own use, and did unlawfully and fraudulently cause the same and the amount of land called for thereby to be surveyed for their own use and benefit, and have, as pretended assignees of your petitioner, fraudulently obtained a patent therefor from the General Land Office of Texas, which survey and patent so unlawfully and fraudulently obtained as aforesaid, your petitioner suggests and avers ought to be canceled, annulled, and made and held void and of none effect, by a decree of your honorable Court, and such decree he here seeks."

8th. That defendants set up title, first, under a grant to Juan N. Seguin, extended by the constitutional Alcalde of Liberty, and conveyances from and under him ; and secondly, under an Act of the Congress of the Republic, approved December 9, 1836, and a patent issued, under said Act, to Menard on January 25, 1838, and conveyances from and under him ; which grant and patent are both charged to have been null and void *ab initio.*

9th. That on the 1st day of February, 1837, Borden and others, acting for Menard, entered upon the land and made a survey thereof—petitioner being then in possession and notifying them of his claim ; and that petitioner has continued to reside upon the land, claiming it as his own, down to the time of instituting this suit.

10th. That the petitioner held peaceable possession of the league and labor from April, 1836, for and during the period of more than five years next thereafter, undisturbed by any

suit, and that he was prevented from complying with the 39th Section of the Act of December, 1836, by the want of a duly organized Court in Galveston county.

11th. That none of the defendants' muniments of title were recorded until more than five years after plaintiff's right to the land had become vested.

The prayer is as follows: "Wherefore he prays that the Galveston City Company, defendants hereto as aforesaid, having appeared and answered in this case as aforesaid, do now answer this amended petition, if they see cause so to do, and that the survey and patent so fraudulently procured and obtained as aforesaid by the said defendants, for their own use and benefit, upon and by virtue of the headright certificate of your petitioner before herein set forth, be brought into Court and cancelled, annulled and made utterly void and of no effect, and be returned so cancelled to the General Land Office by a decree of your honorable Court; and that your petitioner's headright certificate aforesaid be returned to him, and his right to a survey thereon on the land by him applied for as aforesaid be confirmed and decreed to him; and that a patent in due form of law be decreed to issue therefor and thereon to your petitioner; and that a copy of this petition be served upon the Commissioner of the General Land Office of the State of Texas, and that he be bound by all the proceedings of this cause, and that he be ordered to deliver up the said headright certificate to your petitioner, if the same be in his office or possession; and that any and all fraudulent or unauthorised conveyances or assignments, whereby or by virtue or color whereof the said defendants claim the said certificate, or any right, title or interest therein or thereto, for their own use or benefit, be decreed to be null and void and of no effect; and that the pretended location and survey of the league of land on the east end of Galveston Island aforesaid, procured by the said Michael B. Menard under and by virtue of the

said supposed grant to John N. Seguin in manner and form as hereinbefore set forth, be decreed to be null and void from the beginning, together with the said supposed title extended in manner and form as aforesaid by the said J. B. Wood, as constitutional Alcalde of the Municipality of Liberty ; and that the said pretended assignment by the said supposed title purporting to be made by the said John N. Seguin to and in favor of the said Michael B. Menard, bearing date the 23d day of June, A. D. 1834, as aforesaid ; and that the supposed title pretended to be extended by the said J. B. Wood, as constitutional Alcalde of the Municipality of Liberty, set forth in the aforesaid exhibit O, to be null and void from the beginning, together with every pretended right, title or claim, which may appear to be set up, alleged or derived by the said defendants under the said grant from, by or through the said Menard ; and that the said pretended quit claim title or patent to the said Menard, his heirs and assigns, purporting to bear date the 25th day of January, A. D. 1838, set forth in the aforesaid exhibit K, and the two pretended conveyances executed by said Menard, and bearing date the 1st day of January, A. D. 1842, and the other bearing date the 1st day of June, A. D. 1843, set forth in the same exhibit K, be deemed to be null and void and of none effect from the beginning ; and that all the pretended right, title and interest of the defendants purporting or appearing to be set up or derived under, from or by reason of the Act of the Congress of the Republic of Texas set forth in said exhibit K, the quit claim title or patent aforesaid, or the said two last named conveyances, or all or any of them, be decreed to be null and void and of none effect from the beginning ; and that the right and claim of your petitioner herein before set forth and stated to the said league and labor of land situate on the east end of Galveston Island aforesaid, accruing by reason of the premises, and by virtue of the laws herein before set forth and referred to, and of his settlement, selection, improvement and residence afore-

said, be decreed to be fully vested and established in him, and that he be quieted in his possession of the said league and labor of land by a decree of your honorable Court, and that the right to have the same surveyed and patented to and (from) him, and to have and hold the same by a good and valid title from the Government of the State of Texas be decreed to him; and that the said Galveston City Company, and its members and agents be perpetually enjoined from doing, or causing to be done, any act or thing, to hinder, interrupt, or in any manner interfere with, or disquiet your petitioner, his heirs or assigns, in his or their full and peaceable possession of the said league and labor of land, or in taking any step or steps, measure or measures, prescribed or permitted by law, to cause the said league and labor of land to be duly surveyed and a patent to be obtained thereof so as to consummate and perfect the legal title of and to the said league and labor of land in himself, his heirs and assigns forever, and that your petitioner may have his costs of suit, and such other and further relief as the nature and circumstances of this case may require, and to your honor may seem meet."

The defendant's demurrer to this petition was sustained, and (no leave to amend being asked by the plaintiff,) the petitson was dismissed. The plaintiff appealed.

*Allen & Hale*, for appellant. The eleven first points form distinct features of the plaintiff's title, and the question now arises as to the nature, validity and extent of the claim or right of the plaintiff to the land in controversy. The original settlement of Edgar in April, 1836, was made in accordance with the provisions of what is termed in the petition " An Act of the Consultation," adopted on the 31st day of December, 1835. This Act is set forth in exhibit D, and forms a part of the petition; it was, in fact, an Act of the General Council, not of the Consultation; but inasmuch as it is exhibited as a

part of the petition, the error is immaterial, and no advantage can be taken of the variance.  The Act was originally presented to the Council in the form of a report from a select committee, and that report with the resolutions forming a part thereof was adopted by that body.  (See Book marked, Journal Consultation Elct., referred to ·in the stipulation of the parties on file, page 234.)  This adoption of the report made it the Act of the Council and gave it the force of a law, provided it came within the sphere of their legislative powers ; for the expressions, " to adopt a law," " to enact a law," and to " pass a law," are synonimous and convertible in their import.  Let it be remarked that the Council did not merely accept or receive the report, but adopted it as their own Act; and if the exigencies of the country at that time required the passage of this law, then it came within the sphere of their legislative powers.  The report itself shows that the Council considered the adoption of such a law emphatically called for, and the history of their times and the extraordinary measures provided by the law itself for its immediate promulgation, together with three hundred copies of the address to the people respecting the Land Offices, in handbill form, clearly shows that they were not mistaken in their opinion respecting either the existence or imminence of the exigency.

By the 14th Article of the organic law adopted on the 13th November, 1835, the Consultation caused the Land Offices to be closed and the entire land system of the country to be suspended.  The land ˙system then in existence embraced alone the proceedings of Commissioners, Empresarios, Surveyors and ·others concerned in the location of lands.  The 15th Article guarantees to persons who were then citizens of Texas, the benefits of the Colonization Laws under which they emigrated, and to those who might emigrate during the struggle for constitutional liberty, the benefits of the law under which they might emigrate.  As ˙many of the citizens had not perfected their titles, a general apprehension and alarm ensued,

Edgar   v.   The   Gavleston   City   Company.

lest they should be deprived of their rights, by the operation
of the revolution then commenced ; and the people in several
of the Districts and Municipalities refused to permit the ar-
chives belonging to their respective Land Offices to be given
up to the persons appointed to take charge of them.   This
state of things led to the publication of an address by the Con-
vention, the same mentioned in the Act of the Council referred
to ; the object of which was to allay the excitement and quiet
the alarm of the citizens.   It seems that on the 31st Decem-
ber, 1835, the General Council being convinced, as the pub-
lished address of the Convention had not produced its desired
effect, the Council adopted the Act referred to, which had the
effect to meet the then existing exigences and to tranquilize
the popular apprehension.   By this Act, the Council author-
ised and adopted the plan of " selection and settlement," as a
substitute for the suspended land system, and recommended it
to every citizen who had not previously received his land.
This plan of selection and settlement formed no part of the
previous land system of the country.   It was intended as a
substitute for that system while the Land Offices should remain
closed, and operated as an assurance and guarantee to the citi-
zens, that the places of their selection and settlement should
be secured to them by valid titles on the opening of the Land
Offices, and should be held sacred in the eye of the law.   To
give paramount force to this assurance and guarantee, it was
subsequently incorporated into the Constitution of the Re-
public, in the following language .   "In all cases, the actual
settler and occupant of the soil, shall be entitled, in locating
his land, to include his improvement in preference to all other
claims not acquired previous to his settlement, according to
the law of the land and this Constitution."

During the long suspension of the land system, many citi-
zens acquired rights to portions of the vacant lands of the
Republic, by selecting and settling upon their respective por-
tions in accordance with the cited Act of the General Council

and the provision embraced in the Constitution. These rights, it is believed, have been generally respected and protected by law, and mark a peculiar class of cases that arose while Texas was without a land system.

The guarantee contained in the Constitution rendered it obligatory upon the Legislature of the Republic of Texas to provide some statutory means whereby the interested citizen might receive its practical benefits, and in due form of law, obtain titles to their quantum of land, including their settlements and improvements, which were the necessary result of selection and settlement, and accordingly we find in the 25th Section of the Land Law a provision, that an improvement, consisting of at least four acres fenced and cultivated in a farm-like manner, should entitle the settler to embrace it in the location and survey of his headright, which headright, from the nature of things, could in no case exceed a league and labor of land.

The 17th Section of the same law provides that a certificate issued by the Board of Land Commissioners should be sufficient evidence to authorise the Surveyor to survey for the owner or holder thereof, any lands which he might point out agreeably to law, expressly providing that the settler or occupant should have the preference, if their claims were otherwise equal. In the same Section it is further enacted, that in case of several occupants, their conflicting claims should be summarily tried by a Justice of the Peace and six jurors, emphatically, however, reiterating, that in all cases the preference is to be given to the oldest occupant and settler.

In addition to these stringent provisions, other advantages are given to claimants of the first class. By the 39th Section of the Land Law, it is enacted, "That for this class of claimants the Land Office shall be opened and remain six months in operation, granting and completing titles alone to that class of claimants." And by the 17th Section, they were entitled to locate their lands upon any vacant land of the Republic, with-

out regard to any improvements made by individuals who arrived in Texas after the Declaration of Independence. During the first six months after the opening of the Land Offices their operations were confined to this class, and during that time they possessed the right of locating any improvements made by others who might have arrived in Texas subsequently to the date of the Delaration of Independence. After the lapse of this period, however, they were deprived of this extraordinary privilege; they could not locate the improvement o others, but in common with others they possessed and still possess the right of locating their own improvements and settlements. This right has never been taken away by Statute, or subjected to be lost by any delay prescribed by law, consequently it still exists; and the Legislature is alone authorized to determine how long it shall continue. Such are the rights of Edgar in the case at bar—rights instituted by the General Council, guaranteed by the Constitution, and preserved by the Land Law.

Counsel then argued that the land selected and settled was vacant—

1st. Because Galveston Island is within the ten littoral leagues, and not subject to be appropriated by colonization without the consent of the General Government, until after the adoption of the Constitution of the Republic of Texas, which repealed all preexisting land laws.

2d. That the grant to Seguin was illegal, and invalid in its inception.

3d. That the title was made by an officer incompetent to do it.

4th. That the power of attorney from Seguin to Menard was without binding force or efficacy.

5th. That the appellant had the right to acquire the land on Galveston Island, because the law of 15th December, 1836, reserving the Islands, was passed after his selection and settlement.

It is important in the next place to determine the nature
and character of the title set up by Edgar to the land in con-
troversy, and it may be remarked, that it bears none of the
features of a mere equitable one, as contradistinguished from
a legal one.   His possession, right of possession, and right of
property, concur in establishing all the requisites of a legal
title to the place of his selection and settlement.   (2 Black.
Com. 199.)   That title may be clouded by intrusion, adverse
pretensions and fraudulent means practiced by the defendants,
as charged in the petition, but do not change its character.
It may require the further evidence of a patent, in order to
render it perfect.   But many legal titles are inchoate for the
want of certain muniments, and this is an imperfect legal title
in this respect.   But it is still a legal title, and a stronger and
better one than that set up by the defendants.   It has been
demonstrated that this title was created in accordance with
the provisions of enactments adopted and in force while this
country was without Land Offices, and deprived of its accus-
tomed land system.   These enactments vest a legal right in
those designated by them, and acting under them to a grant
of their place of selection and settlement, and there is no
maxim better established than the rule that " when a Statute
gives a right, it gives a legal remedy," not a mere equitable
one, a remedy characterizing and corresponding with the right.

Titles of this description must have as high standing in
Courts of law and equity as those accruing under the pro-
ceedings of a Board of Commissioners, whether created by
Acts of the Congress of the United States or by Acts of the
Legislature of Texas.   The latter, even when resting on mere
location, are sufficient evidence to sustain actions of ejectment.
The former, in numerous decisions, declared to be " titles in-
destructible even by the Government itself, as well before as
after the emination of the patent, which is only one evidence
of title, but not the only one.   (See Hacklin's heirs v. Calet,
Watkins' R. 91, 92; Brenner v. Manlove and others, 1 Scam.

Edgar v. The Galveston City Company.

J. R. 162 ; Statute of Lim. of Texas, Sec. 23 ; Rutherford v. Green's heirs, 1 Whea. 196 ; 4 Cond. 83.)

The twelfth ground hereinbefore specified, on which the plaintiff relies, remains alone to be considered. The case finds that he went into possession of the land in controversy in April, 1836, and had remained in possession ever since. This possession is not denied to have been peaceable in its character, and has been held by virtue of his selection and settlement, and by virtue of his certificate and location—steps constituting the legal requisites in prosecuting the completion of his grant by the procuration of a patent.   By the 39th Section of the Act organizing the County Courts, of December 20th, 1836, (I. p. 156,) it is provided that " any actual settler who is a citizen of this Republic, who may have and hold peaceable possession of any tract of land under a color of title duly proven and recorded in the proper county, for a term of five years, from and after recording said color, his claim shall be considered good and valid, barring the claim or claims of any other persons."   Also, that " a peaceable possession can only be interrupted by an actual suit against the holder thereof." Now we hold it apparent that the plaintiff's title is legal although inchoate.   Such a title implies color—the latter as a necessary incident always attaches to and is inseparable from the former.   There can be no legal title which does not carry its color along with it, and no one can hold under a legal title without holding also under a color of that title.   Color consists of the muniments or evidences of that title, and may be more or less perfect according to the proofs from which it emanates.   Now the color of Edgar's title consists in the parol proofs of his selection, settlement and continuance in possession, and also in the documentary proofs furnished by his certificate and written application filed in the County Surveyor's office at Galveston.   No mode of recording such proofs (excepting so far as the filing and application in the office of the Surveyor may be deemed as records) has ever been provided by

law, nor has any Court or officer ever been established, charged with the duty of receiving and recording such color or proofs of title. But the latter part of the Section referred to meets the case of Edgar by providing that this Act shall not affect the rights of any person who may have been prevented from complying with the provisions of this law "for want of a proper Court or officer being established in due time. It follows that he is not to be prejudiced because his color of title was not recorded, and the case finds that the defendants have from the beginning acted with a full knowledge of his claim and rights. This of itself would have the same effect upon them as if the color of title had been recorded.

On this ground we cannot but regard the position of Mr. Edgar as impregnable. With full notice to the defendants and in their presence he has held peaceable possession for more than five years, of the land in question, without being interrupted by any suit under a color of title, to which the Statute gives the same effect as if it had been recorded. It seems to follow as an unavoidable consequence that his title is now perfect by prescription.

The only point in the case, as it now stands, which is really necessary for decision, is the legal sufficiency of the amended petition—i. e., whether the petition shows any good cause of action. In the brief originally filed, we pointed out a portion of our petition, which alleged the fraudulent abstraction of the headright certificate of the appellant by the appellees, and the part of the prayer, which claimed its restoration, and we insisted that we were certainly entitled to prosecute the suit for this purpose, and therefore that the general demurrer, embracing the whole petition was bad. It would shock the sense of justice, and subvert every principle of law to say, that Edgar could not demand the return of specific property illegally and fraudulently wrested from him, and that he must lose both land and certificate. Upon this point we desire to refer also to the following authorities, to show that a general

demurrer is bad, when any one ground of relief stated in the bill is good. (Livingston v. Story, 9 Pet. 632 ; Leroy v. Veeder, 1 Johns. Ch. 417 ; Laight v. Morgan, 1 Id. 429 ; Coleman v. Veicht, 3 Rand. 598 ; Faucher v. Ingraham, 6 Blackf. 139 ; Dunmack v. Bixley, 20 Pick. 368 ; Western Ins. Co. v-Eagle Ins. Co., 1 Paige 284 ; Bleeker v. Bingham, 3 Paige 246.)

So at law, where a general demurrer is interposed to several counts of a declaration, and any one of them is good, the plaintiff is entitled to judgment. (Freeland v. McCullough, 1 Denio 414 ; U. S. v. White, 2 Hill 59 ; Gurley v. Lee, 11 Gill 2 9 395.

There is also another ground upon which the petition can be sustained, independent of the question of title. Edgar alleges a prior possession peaceably and continuously held, with claim of ownership since 1836. The defendants appear as fraudulent intruders under a void title. Now as against a trespasser without title or with a void title, previous peaceable possession is sufficient to sustain an action. (Christy v. Scott, 14 How. 292 and cases cited.)

*Howard* and *Joseph*, for appellee. Galveston was not in Austin's colony, and he could acquire no right by virtue of his being a colonist of Austin. (Vide Austin's Grant, Coast Leagues ; Translations of Contracts, 1 White Recopilacion, page 616, dated 12th July, 1828 ; Ibid. page 610, dated 27th April, 1825 ; Ibid. page 592, dated 18th February, 1823 ; Vehlein's Petition and Contract ; Translations and Texas Pamphlet, p. 42 ; Boundaries of Brazoria ; May, 1832, Laws C. & Tex., p. 197 ; Boundaries Municipality of Matagorda ; March 6th, 1834, Laws C. & Tex., p. 242 ; Ord. and Dec. p. 114 ; Collectoral District ; Ord. and Dec. p. 79 ; Boundaries of the County of Liberty ; Texas Laws, Vol. 2. p. 84.)

Second : The Island was within the littoral leagues, and if not embraced in Austin's Colony, was not open to location. There is no averment in the petition that the Island was embraced in Austin's Colony.

If the Court do not take judicial cognizance of the Empresarios contracts, then the petition is fatally defective, for it does not aver that the Island was in any Colony ; but if the Court do take judicial cognizance of the Empresarios petitions, contracts, &c., then they take judicial cognizance of all of them. And it appears from all the contracts that Austin petitioned for Galveston Island and was refused. That Vehlein petitioned for it and was refused ; and that to no Empresario was given the right to colonize it.

Third : The Island of Galveston was reserved by the General Government of Mexico, and no one had privilege to make settlements upon it. (Art. 2, Vehlein's Grant, Texas Pamphlet, p. 143 ; Vide Vehlien's Grant in the original. They make a stronger case for the defendants than the translations. Austin's Petition for Second Contract, 1 White's Recop. p. 610.)

The first Congress declared that all the Islands belonging to the Republic were reserved for Government use. (Laws, Vol. 1, p. 76, 10 Dec. 1836.

Congress treated the Islands as reserved. The Courts are bound judicially to know that the Island of Galveston was reserved. (Texas Laws, Vol. 4, p. 4.)

Fourth : The plaintiff did not apply within the time authorized by law, to secure his preference, if any. The Land Office was open six months for claims entitled to a preference, and he did not apply within the six months.

Fifth : The title shown by the petition to be in Menard, is a perfect title and overreaches any inchoate or imperfect claim of the defendant.

Sixth : No right could be acquired by settlement or otherwise after the closing of the Land Office, or after the ratification of the Constitution which suspended the whole land system, until the re-opening of the Land Office.

Seventh : The pretended act of the Provisional Government, inviting people to settle on the public domain, never

ripened into a resolution. It was a mere recommendation of the committee. The adoption of the report was only a discharge of the committee from the further consideration of the subject. The resolutions recommended were never passed. And even if passed, they were suspended by the Constitution, And his settlement having been made after the adoption of the Constitution, was controlled by it.

The Provisional Government was restrained by the organic laws, and had no authority to pass such resolutions, or make any disposition of the public lands. (Vide Plans and Powers of Provisional Gov't, Ord. and Dec. p. 4.)

Eighth : The Constitution was careful in saving to those who served in the army, an equal chance in selecting and locating their lands with those who remained at home. If settlements gave rights, those who shunned the battle-field had the better chance.

If settlements previous to the adoption of the Constitution did give rights either under the Laws of Coahuila and Texas, or under any act of the Provisional Government, the Constitution suspending the whole land system, suspended that law or privilege as a part of the land system, and it was left to Congress to pass laws to protect the soldier, and to determine how preferences should be established. This duty Congress performed by giving the six months preferences, in selecting their lands, to persons residing in the country at the time of the Revolution. If they neglected their opportunity, it is gone from them forever.

Ninth : The whole scope and object of the petition is to recover the league of land on the east end of Galveston Island, and although the averments that the defendants had fraudulently got possession of Edgar's headright certificate, might, in a proper form of action, authorise a recovery, it is evident that in this petition these allegations are mere inducements to the principle object of the petition, and the allegations are

made to explain why the certificate was not in Edgar's possession.

Tenth : The prayer of the petition is inconsistent with the case, or parties made—

1st. The Court will not order the patent obtained on Edgar's certificate to be cancelled on so insufficient a description.

2nd. Unless the State is represented.

3rd. Nor will the Court declare null the patent to Menard, issued by the President, unless the State be represented.

Eleventh : The agreement to sell by the Government to Menard, was a legal appropriation of the lands in controversy, by the Government, to raise money for national purposes. If the terms of sale were not complied with, the lands did not become vacant, unappropriated land, open to location.

The special Act of Congress was a setting the land apart for Government use ; and if the sale to Menard fell through, the lands reverted to the Government for a sale to another.

Twelfth : If the sale of Menard was void, the Law of 10th December, 1836, reserving the Islands was an appropriation of lands to Government purposes, and severed it from the mass of the public domain.

I proceed to discuss more at large the principal propositions embraced in these points, but not following the order in which the points are here stated :

First : The 15th Art. of Ordinance and Decrees guaranties to all citizens who have not acquired their quantity of land, that they should be entitled to the benefits of the laws of colonization under which they emigrated.

In the Revolution no changes in the land system was introduced. It was suspended during the unsettled state of the country, that advantage might not be taken of those engaged in the war.

Lands that were not subject to location prior to the closing

of the Land Office, remained in the same state until the re-opening. of the same under the Republic. Whatever lands were reserved by Coahuila and Texas, or by Mexico, remained reserved until the new Government abandoned the reservation. The revolutionary Government succeeded to all the rights of the old ; the old laws continued until repealed. The Constitution only guarantied to citizens the benefits of the Colonization Laws.

If, then, Galveston Island, or the east end of it had been reserved or appropriated by Mexico or Coahuila and Texas, it continued reserved or appropriated to the new Government until the new Government relinquished the reservation or appropriation in express terms. .

In Wilcox v. Jackson,(13 Peters, p. 498) it is said, whensoever a tract of land shall have once been legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public lands, and no subsequent law, or proclamation, or sale would be considered to embrace it, or to operate upon it, although no other reservation were made of it.

Counsel continued in a very able argument upon the proposition stated, too extended for insertion, and too connected and dependant to be safely abridged.

*W. H. Goddard*, for appellee. Edgar's right to locate his headright certificate on Galveston Island, and the validity of the Seguin grant, as well as of the patent to Menard, require no further discussion than they have already received in the elaborate and conclusive arguments of associate counsel.

I. Conceding for the present, Edgar's right to the location on Galveston Island, under and by virtue of his headright certificate, down to the 29th day of May, 1840, to be unquestionable—it is still claimed for the appellee that the petition shows no right in Edgar to a recovery of the land, or to maintain an action of any kind.

The petition discloses that this certificate, which is alleged
to have been filed by Edgar with the Surveyor of Galveston
county, was, on or about the 29th day of May, 1840, transfer-
red and assigned to the defendant, surrendered by the Sur-
veyor to the assignees, and by them located on other land, for
which the assignees obtained a patent in their own name.

To be sure, the petition alleges, in general terms, that the
transfers and assignments were false and fraudulent; but this
amounts to nothing but an averment of a conclusion of law.
Not a single act or fact is alleged, from which the Court can
infer fraud, or by the proof of which fraud could be estab-
lished.

The first clause of this allegation, " under color of certain
false and fraudulent assignments or conveyances," certainly
cannot be deemed an allegation of facts or circumstances con-
stituting fraud.   Nor can it be said that the petition could not
make a more particular and circumstantial statement.   The
assignments must be taken to have been filed in the General
Land Office, until the contrary is alleged, so that Edgar could
procure an inspection, as well as copies of them.   He might,
then, have ascertained and charged in his petition who it was
that assumed to transfer and assign his certificate, the form
and manner and other circumstances of the assignments, by
what representations and acts on the part of the defendants
the transfers were procured, what was the consideration, if
any, for the assignments—in fine, just the very facts and cir-
cumstances on the proof of which the plaintiff relies to estab-
lish his allegation of fraud.

But no fact is alleged, except the fact of assignments, and
such assignments as justified the Surveyor in the surrender of
the certiffcate to the defendants, and the issuance of a patent
in their name by the Commissioner of the General Land
Office; all the rest of this clause of the allegation is merely
adjective.

The second clause of the allegation, "and by divers other

fraudulent means and pretences," even more obviously than the first, contains no averment of facts, and requires no comment.

The remaining clause, or clauses, "did, without the knowledge, consent, authority or license of your petitioner, obtain and get into their possession the aforesaid headright certificate of your petitioner," &c., must be taken in connection with the preceding clauses, and the other allegations in the petition.

Now it is not asserted that Edgar could not, upon specific allegations that the defendants had wrongfully, and without his authority, got into their possession, and converted to their use, a certificate belonging to him, and valued at a specified sum, maintain an action for the recovery of the certificate, or its value ; but that is not the present case.  The allegation, taken as a whole, shows that the defendants procured the certificate under assignments and transfers, and then merely charges these assignments and transfers to have been false and fraudulent, without averring wherein the fraud consisted, or any facts which imply or establish fraud, unless it be the fact that the defendants, subsequently to the assignments, got possession of the certificate without the authority or knowledge of Edgar.  But this would not vitiate the assignments, and if they stand unimpeached by the allegation of facts and circumstances making them fraudulent, or warranting the presumption of fraud, what is Edgar's right to maintain an action for either the certiffcate or the land, especially, as he nowhere avers that the assignments were not for a fair and full consideration, actually paid by the defendants, and received and still retained by him ?

II. Assuming that Edgar's title to the location on Galveston Island, as set forth in the petition, is invalid in law, and insufficient to warrant a recovery of the land, but conceding the certificate to have been fraudulently obtained by the defendants, and this to be properly and sufficiently averred in the petition, it is still insisted, that, even in this view of the

case, the demurrer was properly sustained ; in other words, that Edgar could not, by proof of any and all of the allegations in his petition, entitle himself to a judgment for the certificate, or its value, or the land on which it is located, for the reason that his petition is not framed for that purpose.

That he does not proceed for the land on which the certificate is located, is clear enough : for he asks that the survey and patent shall be annulled.

It is equally clear that he does not claim the value of the certificate, nor damages for its conversion, for he does not allege what the certificate was worth, or that it was of any value, nor does he aver that he has sustained any damage by reason of its conversion.

What, then, does he seek ? Plainly and simply, the recovery of the league and labor of land on the east end of Galveston Island ; and with this single end in view, he seeks all that he conceives necessary to its attainment, viz : 1st, that the survey and patent on his certificate be cancelled ; 2ndly, that the certificate " be returned to him, and his right to a survey thereon of the land by him applied for as aforesaid be confirmed and decreed to him, and that a patent in due form of law be decreed to issue therefor and thereon to your petitioner," &c. 3dly, that the assignments of said certificate be decreed null and void—so that the patent shall not issue to the assignees ; 4thly, that the pretended title of the defendants to the land be decreed null and void, both the grant to Seguin and the patent to Menard, as well as all claims under and by virtue of them ; 5thly, that his claim to the land by settlement and location, and his right to a survey and patent, be established by a decree of Court ; and 6thly, that the defendants be perpetually enjoined from doing anything to disquiet the petitioner in his possession of the land, or to prevent his having the land surveyed and patented," so as to consummate and perfect the legal title of and to the said league and labor of land in himself, his heirs and assigns forever.

It is only as an instrument or means of perfecting Edgar's title to the land in controversy, that the certificate is mentioned, or its surrender prayed for. It clearly appears that Edgar's sole object is, " a good and valid title from the Government of the State of Texas" to the land which he claims to be his ; that for this purpose he wants a patent ; that to obtain a patent, he wants a survey ; that to procure a survey, he wishes the certificate ; that to get the certificate, he asks that the survey and patent already obtained thereon be cancelled : and that the new patent shall issue to him and not to the defendants, he prays that the assignments of the certificate be decreed null and void.

The Court will observe that, throughout the entire prayer there is not a single alternative clause ; that the relief sought is one entire thing, though consisting of several component parts ; that these parts are not singly sought any farther than as they are each, necessary to the whole—not for themselves, severally, disjunctively, alternatively, but as they collectively make the relief desired ; that the clauses of the prayer are all in the conjunctive ; and that even the prayer for general relief is but a part of the special prayer, and is intended, not to vary the scope of the particular relief sought, but to cover any steps or measures, not specifically enumerated, which may be necessary or appropriate to the obtaining of that relief, viz : a title to the land in controversy, established by a decree of Court, and evidenced by a patent regularly issued.

This being the case, what must be the fate of Edgar's suit, if, on the face of his petition, he has no title to the land sued for ?

*O. C. Hartley*, also for appellee. I. The Islands were reserved from the operation of the General Laws of Colonization of Mexico, and there was no special permission for the settlement of Galveston Island. (See the Laws of Mexico

and of the State of Coahuila and Texas ; also the Colonial Contracts of Austin and Vehlein ; also Act of Congress of 1840, Hart. Dig., Art. 127.)

Edgar acquired no equity to any particular piece of land under the colonization laws ; none, at least, to the land on Galveston Island, even if the settlement of the Island had been permitted, and embraced within Austin's Colony ; for the simple reason that he does not pretend to have settled on the Island until April, 1836.

The clause in the Constitution protecting orders of survey and [settlements, being controlled by the subsequent restriction, that no survey or title, to be thereafter made, shall be valid unless authorized by the Convention or a future Congress of the Republic, (Trimble,v. Smithers, 1 Tex. R. 790 ;) how can the appellant claim to force a title against the express Acts of Congress reserving the Islands, and the special Acts selling this very land ?   And this too, even if he had been a settler on the land prior to the closing of the Land Office in 1835 ?

The orders of survey protected by the Constitution of the Republic, were those only issued to colonists and settlers by Commissioners, (Trimble v. Smithers, 1 Tex. R. 790 ;) and the settlements protected in the same clause, were settlements made before the closing of the Land Offices ; and even these were controlled as in preceding paragraph.   Subsequent legislation gave the preference to the actual occupant, where their claims were otherwise equal.   (Hart. Dig., Art. 1853.) Before this the Islands were reserved by Act of Congress, if not before.   (Hart. Dig., Art. 1780.)

" And whereas many surveys and titles to lands have been made whilst most of the people of Texas were absent from home, serving in the campaign against Bexar, it is hereby declared that all the surveys and locations of land made since the Act of the late Consultation closing the Land Offices, and all titles to land made since that time, are and

shall be null and void. (Const. Rep. Tex. 10 Sec. Genl. Prov., Hart. Dig., p. 39 ; see also 12 Tex. R. 389 ; Rivers v. Foot, 11 Id. 662.)

And whereas the present unsettled state of the country and the general welfare of the people demand that the operations of 'the Land Office and the whole land system shall be suspended until persons serving in the army can have a fair and equal chance with those remaining at home, to select and locate their lands, it is hereby declared that no survey or title which may hereafter be made, shall be valid, unless such survey or title shall be authorized by this Convention, or some future Congress of the Republic. (Ib. Trimble v. Smithers, 1 Tex. R. 790.)

What provision by that Convention or what Act of any future Congress authorized the appellant to select as his headright in April, 1836, the land in controversy, and to claim a title for it from the Government ? On the contrary, there is not merely an absence of any such authorization, but an express prohibition, and an actual sale by Congress of the very land.

Imperfect and inchoate titles under the control of the political authority. (Texas Reps. *passim*.)

Locations on Islands, after the adoption of the Constitution, if ever valid, were destroyed by subsequent Acts of Congress reserving the Islands. (State v. Delesdernier, 7 Tex. R. 76.)

II. As to the question whether this suit can be sustained on the ground that appellant is entitled upon the allegations of his petition, to a cancellation of the patent issued upon his headright certificate, and to return of the certificate to him.

The first objection is, that in the aspect in which the petition presents the cause of action, the prayer for this relief and the allegations upon which such prayer is based, are merely ancillary to the recovery of the particular piece of land, and it does not appear that he desires the cancellation of the patent, unless he can locate his certificate at the place claimed.

He does not pray for the cancellation of the patent at all events, or in the alternative. It did not lie in the mouth of the Court below to say to the plaintiff—"If you desire to proceed for the cancellation of the patent alone, you can do so." After the demurrer was sustained, the plaintiff might have amended, and proceeded with the controversy as to that question, and by making proper parties, if there was no objection to the venue. With no sort of reason can he claim before this Court, that the judgment shall be reversed in order to give him an opportunity to amend.

He cannot be heard to inform this Court, *dehors* his pleadings in the Court below, that he is desirous to pursue the claim for the cancellation of the patent upon his headright, even although he cannot be permitted to locate the certificate on Galveston Island when recovered. He can only reach the ear of this Court, through his pleadings, as to that matter. He cannot be allowed to inform the Court orally or by brief, that he was willing to accept the alternative relief,

Again : Were there or were there not two causes of action in the petition ? Clearly there was only one. Such is the obvious and logical import of the petition. Could the defendant have demurred, first to so much as claimed the land on Galveston Island; and second, as to so much as claimed a cancellation of the patent on Edgar's headright. Blended as the allegations and prayer were, into one, such separate consideration could not have been demanded.

Suppose it were a rule of practice that there should be only one cause of action in a petition, and that where two causes of action were stated, one should be struck out on motion, could the defendant have had any part of the petition struck out under such rule? Clearly not.

Suppose the defendant had demurred on the ground that the petition was multifarious, inasmuch as it sought to recover the land on Galveston Island, and to cancel a patent to land situated elsewhere. The obvious reply would have been that there

were not two causes of action ; that the cancellation of the patent was demanded because otherwise plaintiff could not sustain his claim to the land on Galveston Island. In no other aspect could the allegations in that behalf have been retained if objected to.   But they could be retained in that aspect ; they were therefore not objected to as multifarious. Now upon what sort of reasoning, when the main and only cause of action is defeated, can they claim consideration as an independent cause of action ; not upon amendment in the Court below ; but that they shall upon appeal, assume an independent position, and cause the case to be remanded.

To give the case the direction claimed by the appellant, would be as foreign from a proper mode of adjudicating causes, as was the reading of the Scripture by which the heathen Prince proved there was no God, foreign from proper syntax.

As the question is one of correct practice, it is proper to refer to the provisions of systems of practice similar to our own.

Under the New York Code distinct causes of action are required to be separately stated, (Sec. 167 [143] Voorhies third edition, page 183 ;) and a rule established by the Supreme Court requires them not only to be separately stated, but plainly numbered.   (Id. p. 186, 487.)

Indiana Code, same system, requires them to be stated distinctly in separate paragraphs and numbered.   (Section 49, Indiana Code.)

Ohio Code, same system, has same requirement.   (Sec. 86.)


HEMPHILL, C. J.   This cause comes up by appeal from a judgment sustaining the demurrer of defendant, and dismissing the plaintiff's petition.   The grounds substantially of the plaintiff's claim to the land, viz : the league and labor on the east end of Galveston Island, are his removal to Texas in the

month of April, 1835, his selection, settlement and improve-
ment of the land in the month of April, 1836, and his filing,
on July 8th, 1839, his certificate of headright in the office of
the County Surveyor of Galveston county, with his written
application and direction to survey, by virtue of the certifi-
cate, this league and labor of land, including his improve-
ments.

The plaintiff alleges in substance that the defendant sets up
title to a league of the land under a grant to Juan N. Seguin,
final title being extended in 1834, and conveyances from
and under him, and to the whole of the land under an Act of
the Congress of the Republic of Texas, approved 9th Decem-
ber, 1836, entitled an Act relinquishing one league and one
labor of land to Michael B. Menard and others, on the east
end of Galveston Island, and a patent issued under said Act to
Menard, on the 25th January, 1838, and conveyances from and
under him; which grant, Act of Congress and patent are
charged by the plaintiff in substance to have been null and
void from the beginning, and he also charges that the condi-
tions contained in said Act of Congress were pre-requisites to
the issue of the title, and have never been performed by the
said Menard before or since the issue of the patent. And he
also charges that he notified the persons who, about the 1st of
February, 1837, surveyed the land for or on behalf of said
Menard, of his rights and claims, he being then in possession,
and has ever since continued to reside on the land, claiming
it as his own.

The main, if not the only question is, did the settlement of
the plaintiff in April, 1836, and his improvements, vest such
right in the land as was not impaired or diverted by the Act
of Congress in December, 1836, and the patent to Menard,
in January, 1838. In the consideration of this question the
plaintiff cannot claim more than that the land should be re-
garded as vacant, and as open to settlement as other portions

of the public domain in April, 1836.   Let it be admitted, for the sake of argument, that the land was vacant at that date, did the settlement and improvement by the plaintiff deprive the Government of the power to reserve the land from location, or to grant or sell it to another ?

Settlement under the Laws of Colonization did not give an absolute right.   The foreigner on his domiciliation was at liberty to specify or denounce any vacant land, and the same was granted to him as to a native of the country.   (Art. 4, Decree 16, L. of. C. & T., p. 16.)

In the distribution of lands, preference was first to be given to the military ; second, to Mexican citizens, between whom there was to be no other distinction than that founded on special merit or services to the country, or in equal circumstances a residence in the place where land was situated. (Art 10th, same Decree ; National Colonization Law of August 18th,¶1824.)

From these provisions it appears that settlement gave no right, but only a preference where all other things were equal, thus vesting a wide discretion in the authorities either to grant to one occupant or another.

The Laws of Colonization, with the right to obtain grants of land by survey or patent, by the Act of Consultation, closing the Land Offices on the 13th November, 1835, all officers and persons concerned in the location of lands, were ordered forthwith to desist from their operations, and further locations during the disturbed state of the country, and until the Land Offices could be re-systematized by the competent authorities, were inhibited.   This act was sanctioned by the Constitution of the Republic, and all surveys and locations of land and titles made since the act, were declared null and void.   The ground for this declaration was that most of the people were absent from home, serving in the campaign against Bexar during the time that these titles and surveys were made.   Would not the reason extend to and qualify the provision in the Con-

stitution with reference to settlements, viz : that in all cases the actual settler and occupant of the soil shall be entitled in locating his land, to include his improvement in preference to all claims not acquired previous to his settlement, according to the Law of the land and of this Constitution ? The setting aside of surveys and titles would not avail much to the persons who were absent fighting the battles of the country, if in the mean time those who remained at home could secure the best lands, by camping upon them, or settlement. And it is urged with much plausibility and force, that the improvements referred to in the Constitution could embrace only such settlements as were made in conformity with law, and prior to the Act of the Consultation.

But however that may be, it is clear that by subsequent provision of the Constitution, this right of preference to the actual settler, and all other rights to lands, their surveys and titles were retained within the control of Congress, or the political department of the Government.

It was declared that the unsettled state of the country and the general welfare of the people demanded that the operations of the Land Office, and the whole land system should be suspended until persons serving in the army, could have a fair and equal chance with those remaining at home, to select and locate their lands, and that no survey or title thereafter made, should be valid, unless such survey or title should be authorized by the Convention or some future Congress of the Republic. This provision vests Congress with the power of prescribing the mode in which the right to lands shall be perfected into title ; and in fact that no title shall be valid unless with the sanction of the Legislature. The framers of the Constitution did not give the military the preference secured to them under the former laws, but were determined that they should have a fair and equal chance with those remaining at home. Could this be effected if, during those troublous times, a camper on public lands could claim them as his own ? Would persons serv-

ing in the army have a fair and equal chance if, during the month of April, the time of darkest peril, when every citizen capable of bearing arms was required to repair to the standard of his country, a person could select by settlement a portion of the public lands for his own use ?

The right reserved exclusively by Congress to authorize surveys and titles, and declaring that all titles not sanctioned by Congress should be invalid, vested Congress with the power to prescribe rules regulating the preference right, given to actual settlers under the Constitution, and accordingly in the 17th Section of the Act of December 14th, 1837, (Art. 1853,) it is declared that where more than one application is made for the same tract of land, the settler or occupant shall have the preference, if their claims be otherwise equal ; provided that no location or improvement made since the Declaration of Independence by persons who have since that time arrived in the country, should be regarded when they come in conflict with the claims of those who were here at the Declaration of Independence. But those individuals entitled to the six months preference, shall have the right of locating their land upon any vacant land of the Republic, without regard to any improvements made by individuals who have arrived in Texas since the Declaration of Independence. By the 39th Section, (Art. 1875) it was declared that for the first class of claimants, the Land Office should be opened and remain six months in operation, granting and completing titles alone to that class of claimants.

From these provisions it is manifest that as between individual claimants to land, the right of the oldest occupant or settler, their claims being otherwise equal, would be respected, but that no settlement made since the Declaration of Independence by persons arriving, should be respected if the land were claimed for location by a first class claimant, or one who was here at the Declaration of Independence.

It is also manifest that peculiar and exclusive privilege of

selecting their lands were granted to the first class for six months, and if not exercised within the six months, if they neglected or failed within the prescribed time to secure their improvements, the preference was lost, and the land was open for general location.   This was fully decided after mature consideration in the case of Patton v. Skidmore, (19 Texas, 533.)

The first class had high privileges.   They could disregard, and in fact have the benefit of improvements made by others since the Declaration of Independence, and they cannot complain, if from the letter and spirit of the law, their privileges be held to have ceased at the term of their limitation, and that if they did not locate upon their improvements within their time of preference, they could not claim the land against any other locator, or person who had acquired title from the Government either prior to or subsequent to the expiration of the six months.

If there were no other objection to the claim of the plaintiff —if his settlement had been made before the Declaration of Independence, and was such an occupancy as was in the purview of the Constitution, yet he has forfeited all his preference right to the land, by neglecting to file his certificate and location within the first six months after the opening of the Land Offices.   Had there been no previous title, he should have located within the six months, and title having been issued to Menard, he should, within that time, have filed his certificate and application for survey, otherwise he could not have the shadow of a pretence to contest Menard's title, by virtue of his claim to the preference right under his improvements.   He did not file his certificate for location until seventeen months after the opening of the Land Office, and had then forfeited his claim to the land if any he ever had.

The right of occupants to have the benefit of their improvements as against other individual claimants, could not deprive the Government of all power over the public domain, or the right to sell or grant the land to another, or reserve it from

location altogether ; especially was this the case with regard to improvements made since the Declaration of Independence, which were not properly within the scope and intent of the Constitution. The improvement did not give a right to land. Citizenship gave the right, and the beneficiary might claim the land on which he had settled or camped, or he might claim it elsewhere. The occupancy which gave a preference under the Constitution is not that fixed and absolute right to land which arises from a pre-emption settlement, which in itself is the moving cause of the grant to the identical land, and that alone which is resided upon and cultivated by the settler. In the latter case settlement, and that alone, gives land ; in the former, the grantee has a floating right, which he may locate on his improvements or elsewhere at his pleasure. The Act of Congress relinquishing title to Menard, was passed during the suspension of the entire land system, it being within the power of Congress alone to again put the system into operation and no title or survey was to be valid unless authorized by Congress. Can it be imagined that Congress had not the power under such provisions of the Constitution to sell this land, or to reserve, as the Congress did the next day, 10th December, 1836, the whole of the Island from location ? that with the almost boundless profusion of land, the Government, though impoverished, could not reserve any portion for sale to supply the treasury ? And this because there may have been a straggling settler on some portion of the reservation.

But it is not necessary to prolong this discussion. The right of the plaintiff to the land, if any he ever had, was lost by his neglect to file his application for survey within the proper time, and there was no error on this ground in sustaining the demurrer to his petition.

But it is urged that though he be not entitled to the land, yet that he is entitled to relief on his allegation that the defendant had, by fraudulent means, obtained possession of his certificate, and had the same surveyed and patented, which survey and patent he avers ought to be cancelled.

If the plaintiff had prayed damages for the conversion of his certificate, which he does not, or that the land embraced in the patent should be held in trust for him, or perhaps generally for its restoration to him, there would be ground for the suggestion that in this particular he might be entitled to relief, though it were denied him with reference to the land on the east end of Galveston Island. But it will be seen from his prayer that he does not seek any separate relief with regard to the certificate. The sole object, aim and end of the plaintiff is to perfect his supposed claim to the land in question into title. The possession of his certificate is deemed necessary to secure this object, and the matters alleged by him cannot be regarded as more than inducements to show why he was out of possession, and that he might recover the same again for the single purpose of securing his title to the land in controversy. He does not pray for any alternative relief. The petition has but one ultimate scope and object, and all its parts, allegations and prayers are made to conduce to that end and that alone. The certificate is sought only as an instrument to secure that object, and not for itself, or for its value, or uses, otherwise than as conducive to the main design ; and regarding this a controversy for the land claimed by the plaintiff, we are of opinion that there was no error in the judgment, and that the same be affirmed.

Judgment affirmed.