HAWKINS et al. v. STILES et al.

(Court of Civil Appeals of Texas. Austin. Feb. 5, 1913. On Motion for Rehearing May 21, 1913.)

1. HUSBAND AND WIFE (§ 254*)—COMMUNITY PROPERTY — PROPERTY ACQUIRED DURING MARRIAGE.

Act Aug. 26, 1856 (Laws 1856, c. 128), provided that the Mississippi and Pacific Railroad land reserve should be subject to location and sale; that all settlers thereon might purchase 160 acres at 50 cents an acre upon having the land surveyed and the field notes returned, as well as the payment of the 50 cents an acre by January 1, 1858; that the holders of genuine land certificates, etc., might locate the same within such reserve, and that the land commissioner might issue land scrip at 50 cents an acre. Thereafter certain parties, who had settled on land on such reserve prior to that act, had their respective tracts surveyed and the field notes returned, and subsequently assigned their rights to S., who thereafter married, and subsequent to his marriage, made the payment of 50 cents an acre and received patents for the land. *Held*, that the assignors of S. acquired no title by the statute, or by making the surveys and filing the field notes, but merely acquired the preferential right to purchase the land, and that the title of S. had its inception at the time of the payment of the 50 cents an acre, since there was no inception of title until a contractual relation was created by a compliance with all the terms of the offer by the state, and hence, the title of S. having had its inception during marriage, the property was community property, and not the separate property of S.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 897–899; Dec. Dig. § 254.*]

2. PUBLIC LANDS (§ 172*)—CONVEYANCE BY OCCUPANT.

An occupant of public land, who has no title thereto, can convey no title to another.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 523–543; Dec. Dig. § 172.*]

3. PROPERTY (§ 7*) — OWNERSHIP — "TITLE" — "EQUITABLE OWNERSHIP."

"Title" means ownership, either equitable or legal. "Equitable ownership" means a present title in land which will ripen into legal ownership upon the performance of conditions subsequent. Title has its inception in beginning of a contractual relation which entitles a party to the land upon compliance with his part of the contract.

[Ed. Note.—For other cases, see Property, Cent. Dig. § 9; Dec. Dig. § 7.*

For other definitions, see Words and Phrases, vol. 8, pp. 6979–6982.]

4. DESCENT AND DISTRIBUTION (§ 8*)—MORTGAGES (§ 591*)—"EQUITY OF REDEMPTION."

An "equity of redemption" is an interest in the land mortgaged which will descend to the heir of the mortgagor, who in legal contemplation continued to be the owner of the land. It is considered to be the real and beneficial estate, tantamount to the fee at law (quoting 3 Words and Phrases, 2447).

[Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig. §§ 33–39; Dec. Dig. § 8;* Mortgages, Cent. Dig. §§ 1693, 1694–1708; Dec. Dig. § 591.*

For other definitions, see Words and Phrases, vol. 8, p. 7653.]

Key, C. J., dissenting.

Appeal from District Court, Ellis County; C. M. Smithdeal, Judge.

Action by Sam Stiles and others against Frank Hawkins and another. From a judgment for plaintiffs, defendants appeal. Reversed and rendered.

S. C. Padelford, of Cleburne, and G. C. Groce, of Waxahachie, for appellants. Langford & Chesley, of Hamilton, and Supple & Harding, of Waxahachie, for appellees.

RICE, J. The land in controversy herein was within the Mississippi and Pacific Railroad reservation, and lies near Midlothian in Ellis county, consisting of two surveys of 160 acres each, patented to George Stiles, one as the assignee of J. T., and the other as the assignee of W. W. Rawls, by virtue of his having purchased whatever rights the said Rawlses may have been entitled to as actual settlers thereon under the act of August 26, 1856, opening up said reservation to settlement, and the payment by him of the stipulated amount due the state. We think the evidence is sufficient to show that both of the Rawlses, prior to their transfer of whatever rights they had therein to George Stiles, were actual settlers thereon, and had caused said respective tracts to be surveyed and the field notes thereof returned to the General Land Office as prescribed by said act, but had not paid the 50 cents an acre due the state, and by the terms of said transfers said Stiles was required to pay same, together with the land office fees. The transfers above mentioned were made to Geo. Stiles under date of January, 1858, and he was married to Zilpah Stiles on the 25th of November of the same year, and the lands were patented to him as assignee of said parties on September 13, 1859, and November 23, 1859, respectively, he having paid at said times the purchase price thereof to the state, to wit, the sum of 50 cents per acre and the patent fees. This payment was made out of the community funds of himself and wife. After marriage he and his wife made their home upon said tracts of land, where they continued to live until his death, which occurred in 1886. There were no children born to this union, and he left no will. His widow, in about two years thereafter, married one Mullins, who

died before she did, leaving no children, and upon her death in 1909 she left a will, which was duly probated, devising these two tracts of land to B. F. Hawkins and Geo. Stell, appellees herein; and this suit was brought on January 15, 1910, by Sam Stiles, a brother, and Mrs. Jane Merrill, Mrs. Nancy Kemp, and Mrs. Sarah Rhodes, all femes sole, sisters, and Sam Henry Stiles, a nephew, the son of a deceased brother, originally joined as defendant, but subsequently became a plaintiff, as plaintiffs, against said Hawkins and Stell in trespass to try title to recover an undivided one-half interest therein, for partition thereof, and for rents. Defendants answered by pleas of not guilty, .the statutes of three, five, ten, and four years' limitation as to the land, as well as stale demand and two years' limitation as against the rents. There was a jury trial, resulting in a verdict and judgment for plaintiffs for their one-half interest in the land as claimed by them and for rents, from which this appeal is prosecuted.

It is clearly shown by the evidence that during the marriage of George and Zilpah Stiles they both considered and treated this land as community property, and made a joint will under such belief. While there are many interesting questions raised by this appeal, which are fully discussed in briefs of counsel, and presented upon argument, we will, however, pretermit a discussion of all of them except the one raised by the fifth assignment, which complains of the action of the court in refusing to instruct a verdict in behalf of appellants, and which, if decided in their favor, is determinative of this appeal, rendering unnecessary a consideration of the other questions presented.

The contention of appellants is that the land in question was the community property of Geo. Stiles and his wife, and that upon his death, without issue, his wife surviving, it became her separate property, and she had a right to devise the same to them as was done, and that plaintiffs, therefore, had no interest therein; while the contention of appellees is that under the uncontroverted evidence in the case the land in controversy belonged to the separate estate of George Stiles, and at his death descended, one moiety to his surviving wife and the other to his collateral heirs, for which reason they were entitled to recover. The difficulty in deciding the question at issue is in determining when the title to the land in controversy vested, or, to be more explicit, to determine the inception of the title; because if the transfer from the Rawlses to Stiles vested in him title, or an incipient title, then the contention of appellees is well taken and should prevail. But is this true? The land was embraced in the Mississippi and Pacific Railroad Reservation. See 4 Gammel's Laws of Texas, p. 7 et seq., which land was opened to settlement by act of August 26, 1856 (Gammel's Laws of Tex.

vol. 4, p. 474), which provides that "from and after the first day of January, 1857, what is known as the Mississippi and Pacific Railroad Land Reserve shall be subject to location and sale, as hereinafter prescribed." The second section of said act provides that all settlers on said land are entitled to purchase not exceeding 160 acres thereof at 50 cents per acre, upon the settler's having the land surveyed and the field notes returned to the General Land Office by the 1st day of January, 1858, as well as the payment of said 50 cents per acre therefor by said time. It is further provided by section 3 thereof that the holder of any genuine land certificate, bounty warrant, headright certificate or railroad certificate, shall, after the 1st of March, 1857, have a right to locate same within said reserve. And by section 4 the land commissioner, after the 1st of March, 1857, was required, upon the request of any party, to issue land scrip at 50 cents per acre, which might be located within said reserve, etc. This act was amended November 28, 1857, so as to extend the time of payment to October 1, 1859, but providing that the field notes should be returned by April 1, 1858. It was thereafter amended so as to still further extend the time for filing field notes until the 1st of January, 1859. See Paschal's Digest of Laws, vol. 1, pp. 844-846.

It is appellants' contention that no title vested in Geo. Stiles by reason of the transfer from the Rawlses, and that this act did not constitute the beginning or inception of his title (citing in support thereof Woods v. Durrett, 28 Tex. 430; Webb v. Webb, 15 Tex. 274; Wilkinson v. Wilkinson, 20 Tex. 237; Palmer v. Chandler, 47 Tex. 332; Williams v. Finley, 99 Tex. 468, 90 S. W. 1087; Mills v. Brown, 69 Tex. 244, 6 S. W. 612; Lamb v. James, 87 Tex. 486, 29 S. W. 647; Rayner Cattle Co. v. Bedford, 91 Tex. 642, 44 S. W. 410, 45 S. W. 554; Simpson v. Oats, 102 Tex. 186, 114 S. W. 105; Gafford v. Foster, 36 Tex. Civ. App. 56, 81 S. W. 63; and Clark v. Altizer, 145 S. W. 1041), while appellee contends that by reason of the transfer from the Rawlses to Geo. Stiles, they, having previously surveyed the land and returned the field notes to the General Land Office, gave to him an inchoate title, which was subsequently perfected by payment of the purchase money to the state, and therefore he had such title, in contemplation of law, at the very time of such transfer, for which reason the land became his separate property, one-half of which, under the law, they were entitled upon his death to inherit, under the facts in evidence, in support of which they cite Welder v. Lambert, 91 Tex. 510, 44 S. W. 281; Creamer v. Briscoe, 101 Tex. 491, 109 S. W. 911, 17 L. R. A. (N. S.) 154, and note, 130 Am. St. Rep. 869; Hasseldenz v. Dofflemyre, 45 S. W. 830; Porter v. Chronister, 58 Tex. 53; Norton v. Cantagrel, 60 Tex. 538; Auerbach v. Wylie, 84 Tex. 615, 19 S. W. 856, 20 S. W. 776.

Under the authorities last cited, if it is admitted that the inception of the title took place at the time of the transfer to Geo. Stiles, then the subsequent payment, though made after his marriage, will relate back to the date of said transfer, and constitute the land his separate property, subject to a charge in favor of the community for reimbursement; but this is not admitted, and is the point at issue. In discussing the question as to what interest was conveyed by the Rawlses' deeds, and in reviewing the cases cited by appellant, we quote from brief of counsel for appellant as follows:

"In Woods v. Durrett, supra, it was held that a settlement within this reservation before it was opened for settlement conferred no right, and that the opening act conferred none, except in accordance and on compliance with its terms.

"Webb v. Webb, supra, is a case where a man and his wife came to Texas in January, 1833. The husband, being entitled to a headright under the colonization laws as the head of a family, selected his land in his wife's lifetime, but the extension of the title was delayed by the refusal of the empressario to assent to it until the wife died. After her death the objections were withdrawn and the title was extended. It was held that the land was the separate property of the husband, because up to the wife's death nothing had been done upon which an equity in favor of her heirs could attach to the land, not even proof of right under the colonization laws having been made. In that case while the colonist, as the head of the family, was entitled to a headright, he had done nothing within the lifetime of his wife to bind the government to grant him any particular tract, though he had selected the tract he desired, and presumably had advised the government officials of his selection. While this very land was afterwards granted to him, the wife was held not to have acquired any interest in it. In other words, no consideration in which his wife was interested moved to the government during her lifetime, and hence she acquired no interest.

"In Wilkinson v. Wilkinson, supra, the husband and head of the family, acquired a conditional headright under the act of 1839, and complied during his wife's lifetime with the requirements of the law to entitle him to an unconditional certificate, but he did not take it out until after his wife's death, and the land was subsequently patented to him. It was held that the land was community property of the husband and wife, on the theory that these grants were to the family, to the wife as much as to the husband, and the wife, having performed her duty under the law of the grant, acquired her interest.

"Palmer v. Chandler, supra, is a case in which a pre-emption settler, after a survey of his land and occupancy of it for about two years, sold to another and took a note for part of the agreed consideration of the conveyance, which was attempted to be enforced as a lien upon the land. It was held that the original pre-emptor, by his survey and settlement, acquired no vested right in the land, and that his sale was an abandonment of his inchoate right to it, that the right of his vendee as a pre-emption settler received no aid by reason of the previous occupancy by the original pre-emptor, and that the transaction created no lien on the land. The case was held to be, in principle, indentical with others involving attempted sales of portions of the public domain by mere occupants. The logic of this decision, so far as we know, has never been denied or impaired, though the law, as it existed when the facts happened upon which the case is based, has been changed so as to allow pre-emptors, homesteaders, and purchasers of school lands to sell their holdings before acquiring full title. The principles of this case are recognized in Williams v. Finley, supra, and numerous other cases, holding, in substance, that in cases of sales of lands, the title to which is in the state, no lien is acquired, but where such sales are on credit, the value of improvements, may be recovered as a personal claim. In Clark v. Altizer, supra, the same principle is recognized.

"In Mills v. Brown, supra, a widow, who was herself the head of a family, applied for a pre-emption, caused it to be surveyed, and paid the surveyor's fees. She then married, and with her husband occupied the land for the time prescribed by law, and after the death of the wife the land was patented to her heirs. It was held that the land was acquired, not by the survey, but by the occupancy of the husband and wife, and was their community property.

"Lamb v. Jones, Rayner Cattle Co. v. Bedford, and Simpson v. Oats, supra, hold that attempted conveyances of public lands pass no interest in the land, and do not create the relation of vendor and vendee, and furnish no obstacle to the acquisition of the land by the grantees in such conveyances in the manner pointed out by law for obtaining the state's title to such lands.

"In Welder v. Lambert, supra, which was decided in accordance with the Spanish law, it was held that where it appears that the origin of the title preceded the marriage, notwithstanding the fact that it was extended subsequent to it, the land became the separate property of the husband. In that case Power and Hewitson, impressarios, under their colonization contract with the state of Coahuila and Texas, acquired the right to a grant of lands on compliance with the terms of such contract. Power, then single, after partial compliance, subsequently married, and the performance of the contract was completed, and grant of the lands issued after such marriage. As between the heirs by this marriage and those by a subsequent marriage,

the land so acquired was his separate property; the community estate of the first marriage being entitled to a reimbursement for labor and expenditures in performance of the contract during the existence of such marriage. The gist of the holding was that Power's right, being founded on a contract that a partial performance on his part previous to his marriage, in contemplation of law, was the beginning or inception of his title, and therefore the extending of the title or its completion subsequent to marriage, did not make the property community.

"In Creamer v. Briscoe, supra, the same doctrine is announced. In that case, the husband and wife having settled on land for the purpose of acquiring homestead donation from the state, the husband died, and the wife married again before the expiration of the three years' occupancy necessary to acquire title; this being completed patent issued to the husband. Held that the land was community property of the husband and the first wife, and that as against her heirs the heirs of the second wife had no interest. The occupancy of the first wife for the purpose of establishing a homestead was the doing of such act as in law was regarded as the incipiency or beginning of the title."

These cases, we think, do not contravene the doctrine contended for by appellant. It seems to us that the Rawlses at the time of their transfers to Stiles had nothing more than the mere privilege of purchasing the land to the exclusion of any one else. They were living upon the land at the time it was opened for settlement; they had it surveyed, and returned the field notes to the land office, but at the time of the transfer had not paid the purchase price. The state could not compel them to pay this purchase money and accept the title, and they were at liberty at any time to abandon the land. In the pre-emption and homestead cases heretofore cited it required actual residence upon the land, with the requisite purpose, in order to establish the right of ownership, and without which no such right existed, notwithstanding the compliance with other portions of the statute.

In discussing somewhat similar statutes in 32 Cyc, p. 827, subd. 7, it is said: "The statutes formerly gave to settlers on public lands who had improved the same, a preference right to purchase such lands up to a certain amount at the minimum price of such lands, upon complying with the statutory requirements, which was termed the right of pre-emption. Pre-emption rights have been the subject of much litigation; but as the pre-emption laws have been repealed, save in a few particulars, it is deemed sufficient to merely refer in the note to a number of cases in which such rights have been referred to or discussed, and to draw attention to the fact that the right of pre-emption was nothing more than an offer by the government to an individual settled upon public land, which the latter might or might not accept, that the settler got no title until he had complied with the conditions of the law, and that if he was unable or unwilling to purchase at the government price at the time fixed by law, he had no further rights, but was liable to be turned out of possession as an intruder" (referring to numerous cases supporting and illustrating the text). See, also, 41 Century Digest, Title "Public Lands," §§ 65–71.

In Hutton v. Frisbie, 37 Cal. 475, it is said that: "After a settler has moved on and taken the prescribed steps to acquire preemption, but before he has perfected his right by payment, Congress has the power to withdraw the land from the operation of the general pre-emption laws, and deprive the settler of a right to perfect his claim and enter the land, and confer a right of entry upon another."

In Hemphill v. Davies, 38 Cal. 577, it is held that: "A declaratory statement for the purpose of pre-empting lands, or the register's certificate of the filing of such statement, confers no title. It is merely an offer to purchase, after the requisite proof of evidence, qualifications, etc., shall be made."

In Cothrin v. Faber, 68 Cal. 39, 4 Pac. 940, 8 Pac. 599, it is said that where a person "was permitted to enter on land, pursuant to proceedings initiated by him," at a period previous to such entry, "and to pay for it, receiving from the government the appropriate evidence of payment, he acquired a right which related back to the inception of the proceedings taken by him for its acquisition under the pre-emption laws, * * * and entitled him to the ultimate conveyance of the title to him."

Again in St. Onge v. Day, 11 Colo. 368, 18 Pac. 278, it is held that: "One who files a pre-emption claim, * * * and afterwards proves up and gets the receiver's receipt, is vested with title thereto, which title relates back to the date of filing, from which time he can recover against a person using or trespassing upon said land."

In Jackson v. Wilcox, 2 Ill. (1 Scam.) 344, it is held that: "The pre-emption laws grant to the pre-emptioner an estate in land upon conditions, which become absolute upon the performance of those conditions."

In Camp v. Smith, 2 Minn. 155 (Gil. 131), it is held that the pre-emption act of Congress of September 4, 1841, gives to certain occupants the right to purchase the lands they occupy at the minimum price, to the exclusion of all others. The title depends upon the purchase as soon as made, like the title of any other purchaser, and not upon a previous entry and occupation.

In Grand Gulf R. & Banking Co. v. Bryan, 16 Miss. (8 Smedes & M.) 234, the court says: "A mere right of pre-emption is not a title; it is only a proffer to a certain class of persons that they may become purchasers, if they will; without payment, or an offer to

pay, it confers no equity, and only confers one where the party has consented to accept the offer by payment, or by claiming the benefit of the law in the proper manner, within the required time." The same doctrine has been announced by the Supreme Court of the United States in Hutchins v. Low, 15 Wall. 77, 21 L. Ed. 82; Frisbie v. Whitney, 9 Wall. 187, 19 L. Ed. 668.

In Bray v. Ragsdale, 53 Mo. 170, it was held that: "A person settling upon the land under a pre-emption obtains no title till he has complied with the conditions of the law. * * * Till he fulfills the prescribed conditions of the law, the title remains in the government. He may abandon the pre-empted lands at any time, and then there could be no pretext that he had either a legal or an equitable seizure." This was a case in which the defendant's pre-emption was sought to be levied upon and sold as an interest in land, and the court held that it could not be done.

In Bowers v. Keesecker, 14 Iowa, 301, where an intestate had established his right to pre-empt a city lot under an act of Congress, but had paid no money, nor obtained a duplicate receipt, or other evidence of title to the property, it was held that he was not invested with an equitable estate, and that his administrator had power to sell and convey the same as personalty.

The pre-emption laws of the United States and the other states from whose decisions we have copied the above extracts, appear to be dissimilar to our pre-emption law, in that under them payment of a stipulated amount as purchase money, as well as occupancy, proof of settlement, etc., was required, while under our law no payment was necessary, for which reason we think their holdings should be persuasive in the instant case, because the statute opening up this reservation required not only settlement, survey and filing of field notes in the land office within the prescribed time, but, in addition thereto made it necessary, before title should vest, that the settler should pay a stipulated amount as purchase price. We are constrained to believe that under this statute no title could be acquired unless its terms were complied with; that three things were essential to obtaining title on the part of the Rawlses, or those who claim under them, to wit, they must have been settlers, they must have had the land surveyed and the field notes returned to the land office, and must, in addition, have paid the purchase money. Without the concurrence of these three elements, no title vested; and the mere surveying and filing of field notes was not the inception or origin of title, as contended by appellees, but furnished, at most, merely a basis for the privilege of purchasing. It will be recalled that after this reservation was opened for settlement, other persons were granted the right to purchase scrip at the same price per acre as charged actual settlers, which they might thereafter locate upon land within said reservation, upon the conditions imposed by the statute; but the actual settler was given a preferential right to purchase, provided he surveyed the land, returned the field notes to the land office, and thereafter, within the stipulated time, paid the commissioner therefor. The state was under no obligation to grant this right; it was a mere privilege extended to the settlers on the land at the time it was opened for settlement and sale, out of regard for the fact that they had settled and improved the land. This was a mere gratuity. If the settler saw fit to accept and comply with the terms of the statute within the time prescribed, then it offered to convey the land to him in preference to any other person wishing to purchase. There was not, in advance of such compliance, any right acquired by the settler. He was not bound to accept; had the absolute right to abandon the land at any time and refuse to comply with the state's offer. No benefit had inured to the state, and it was therefore not even morally bound, before the payment of the money or tender thereof, to make title to the settler. Can it be argued that an incipient title is a result of a mere partial performance of the conditions imposed by the state for the vesting of title. It is true that, without the performance of the first two conditions, no preference was even granted; but it is likewise true that, without the paying of the money, no actual right or title vested. Others had the right to buy without such conditions, by merely paying the purchase price, giving the actual settler a mere preference to purchase the tract upon which he settled. A failure to exercise this right of purchase, after performing the first two conditions within the prescribed time, terminated this privilege. Consequently we think no right to the land in question began or sprang into existence until all three of the conditions were complied with; and therefore all these requirements, in our judgment, were conditions precedent to the vesting of title in the Rawlses or their transferee.

We therefore hold that no title vested in George Stiles until he paid the purchase money, which is shown to have been subsequent to his marriage and out of community funds, and for which reason it follows that the property in question at the time of his death was community property between himself and his wife, Zilpah, and therefore there being no issue of said marriage, became her separate property, which she had the right to bequeath by will. Hence it becomes our duty to render such judgment as the court below should have rendered; we therefore reverse the judgment of the court below and here render judgment for appellants.

Reversed and rendered.

KEY, C. J. (dissenting). Being unable to concur with my Associates in the holding that the land in controversy was the commu-

nity property of George Stiles, the reasons for such nonconcurrence will be stated:

It has always been the policy of this state to encourage actual occupancy and settlement within its borders. At the time in question it owned many millions of acres of public domain. In addition to prior laws granting headright and bounty warrants to persons becoming citizens of the state, or rendering certain public services, a law had been enacted donating 160 acres of public domain to actual settlers. In 1853 a law was enacted which sought to induce the construction of a railroad across the state from its eastern to its western border. It offered 20 sections of land per mile for the construction of such road, and created a reservation of all the vacant and unappropriated lands belonging to the state east of the 103 parallel of longitude west from Greenwich, and embraced between the parallels of latitude 31 and 33 north, and all of such lands west of 103 deg. of longitude and embraced between the parallels of latitude 30 deg. 30′ and 32 degs. north latitude, for the purposes set forth in the act, such reservation to continue until the road was located, and thereafter was restricted to 30 miles on each side of the road. This reservation included a vast body of the best unappropriated public domain within the borders of the state. After waiting about three years and finding that no person or company had undertaken to construct the road, the Legislature passed the law of August 26, 1856 (Laws 1856, c. 128), abrogating the reservation, and declaring the public land embraced therein subject to location and sale in the manner prescribed by that statute. The second section of that act reads as follows: "That all persons who are now settled upon any portion of the said reserve belonging to the state shall pay fifty cents per acre for his or her claim not to exceed one hundred and sixty acres, and the said parties are hereby required to have their lands surveyed by the district or county surveyor, and the field notes returned to the General Land Office by the first day of January, A. D. 1858, provided that all persons now resident upon the said reserve shall, on or before the 1st day of January, A. D. 1858, pay over to the Commissioner of the General Land Office the said amount of fifty cents per acre, for the amount of their claims. And the commissioner is hereby required to patent the surveys authorized by this section as other surveys."

This act was afterwards amended, as pointed out in the majority opinion, by extending the time for returning field notes and making payments. The act of November 28, 1857, which extended the time of payment to the 1st day of October, 1859, as does the original act, designated the land as the "claim of the settler"; and it declared that "Should any person fail to pay for his or her land by that time, the land so claimed by him shall be subject to relocation as other public do-main belonging to the state." The amendatory act of February 10, 1858 (Laws 1857–58, c. 118), extended relief to both pre-emption settlers and settlers in the reservation, and showed upon its face that the Legislature considered that each class of settlers had acquired similar rights, and were entitled to the same consideration and benefits, on account of the fact of their prior settlement upon the land. The first section of that act grants relief to pre-emption settlers and their assignees by extending the time for making surveys and returning the field notes to the land office. The second section reads as follows: "Sec. 2. That all those actual settlers or their assigns, who are required by an act, passed August 26th, 1856, for location, settlement and survey of the Pacific Railroad Reservation, and an act supplemental thereto, passed for the relief of said actual settlers by the 7th Legislature, to pay fifty cents per acre, shall have until the first day of January, 1859, to have their surveys made and field notes returned to the General Land Office."

Considering all of these laws together, including the one which created the reservation, and considering other facts that are historical in their nature, the matter may be summarized somewhat as follows: It was the settled policy of the state to secure, not only population, but that class of citizens who would establish homes and develop the resources of the state; and, in order to accomplish that purpose, it had long been the policy to offer special inducements to actual settlers. The railroad reservation referred to, while it did not divest the state of title, nor permanently appropriate the land for another purpose, had the effect of militating against the cherished policy of settlement and development as to a large area of the best territory in the state. Knowing the state's settled policy to encourage the actual settler, and doubtless anticipating that the scheme for the construction of the railroad would be abandoned and the reservation abrogated, no doubt many families settled upon the land under the belief that when the ban of the reservation was removed the state, acting through its law-making department, would recognize the fact that it rested under a moral obligation to protect such actual settlers. That the Legislature did this, and, on account of such settlements, secured to such settlers privileges and benefits concerning such lands that were not accorded to others is clear to my mind. It is true that the act removing the reservation contained provisions authorizing the location of certificates and land scrip within the reservation, and provided for scrip to be issued at 50 cents per acre. But no preference right was given to locate on any particular lands, nor was time allowed to pay for scrip. So, while it is true that the settler was required to pay to the state as much as the scrip loca-

tor, he was not required to pay at once, and the time of payment was finally extended to 1861; and the exclusive right to a particular tract of land was by the law itself vested in him, and no such right was vested in the locator. And it seems to me that if the fact of settlement is to be treated as only a consideration for these privileges and benefits, nevertheless, as these were important factors in obtaining the title, the consideration which secured them ought to be deemed the inception of the title.

It is stated in the majority opinion that the state was under no obligation to grant the right it did to actual settlers, and that the right so granted was a mere gratuity. For the reasons stated, I do not concur in that view; on the contrary, it is believed that a high moral obligation rested upon the state to in some manner compensate those who had made actual settlement, and I have no doubt that the second section of the act of August 26, 1856, securing to such settlers the exclusive right to purchase on time the land upon which they had settled, was enacted for the purpose of discharging that obligation. With the exception that at the time such settlements were made they were not authorized by law, they were as much in furtherance of the state's cherished public policy as were pre-emption and other settlements which were made outside of the reservation; and for that reason it was the moral duty of the state, when the reservation was removed, to secure to such settlers the prior right to the lands upon which they had settled. Therefore, looking to the several acts referred to, we find that the Legislature not only recognized the fact that these settlers were asserting a claim to the land, which it was the moral duty of the state to protect, but we find that section 2 was enacted for the accomplishment of that purpose; and, in addition to that, one of the acts constitutes a legislative construction of the former acts to the effect that on account of settlement alone, and of the act of August 26, 1856, such settlers had acquired a vendible title, because the supplemental act referred to expressly grants to *the assigns of such settlers*, as well as the settlers themselves, further time within which to have their lands surveyed, and the field notes returned to the General Land Office. And another act prescribed that upon failure to pay by the time stated the land should be subject to relocation, thereby treating the fact of settlement and survey as equivalent to a location under certificate or scrip.

In determining whether or not settlement upon public domain is to be regarded as part of the consideration moving the state to grant the land to the settler, it seems to me to be immaterial whether or not the settlement was made in pursuance of a law authorizing it, or was subsequently ratified and treated by the state as part of such consideration. In both cases the fact of settlement subserves the same public interest and promotes the same public policy.

The authorities cited in the majority opinion show that, in determining the question whether property belongs to the separate or community estate, recourse must be had to the origin or inception of the title, and that if the consideration which secured the inception of the title was furnished by the separate estate, the property will belong to that estate, although the remainder, and even the greater portion of the consideration, may subsequently be furnished by the community estate; and the reverse is true if the first part of the consideration is furnished by the community estate. In this case the majority of the court hold that the inception of Stiles' title was the payment to the state of 50 cents an acre for the land, and that as such payment was made by Stiles out of community funds, the land became community property. The writer differs from that conclusion, and is of the opinion that the inception of the Stiles title was his purchase of the Rawls titles, and as that occurred before his marriage the land became his separate property.

It is held in the majority opinion that the statute removing the reservation and authorizing sales to actual settlers conferred upon the latter nothing more than an option or preference right to purchase the land. It is also stated in that opinion that no obligation rested upon the settlers to do anything. It was not necessary for the settlers to obligate themselves to pay for the land and perfect their title before they could acquire an inchoate right thereto. It is believed to be a sound proposition of law, well settled in this state by judicial determination, that whenever such steps have been taken as will secure to a particular person the exclusive right as against all other persons, except the state, to a particular tract of public land, then the person to whom such right has been secured has at least an equitable title to such land, which title may subsequently be perfected by performance of such additional acts as may be necessary to obtain the legal title from the state. In the application of this principle of law it has been held that when a person, claiming as a pre-emptor, has become an actual settler upon the land, and had it surveyed, it is thereby segregated from the body of the public domain, and such pre-emptor, although he may not have resided upon the land for half the time required to perfect his title, has acquired an inchoate right or equitable title thereto; and this is true although such pre-emptor may thereafter lawfully abandon his claim and never perfect his title. And the same is true as to a claim founded upon a certificate location. When the certificate has been delivered to the proper surveyor, and the survey has been made in the manner prescribed by law, the result is that the land so

surveyed is segregated from the public domain, and the owner of the certificate has an equitable title thereto, although he may thereafter abandon his location and claim, and never perfect his title; but in neither of the instances stated is it necessary that the claimant of the land must have obligated himself to perfect his title or to do anything else in order to acquire such inchoate right or equitable title.

So in this case, applying the rule of law referred to, it seems to me that it should be held that it was the intention of the Legislature, in enacting the second section of the law removing the ban of the reservation, to reward those who had improved such lands and established their homes thereon by securing to them and their vendees the exclusive right to purchase the land from the state, and that such legislation was intended to ratify and vitalize the fact of settlement by treating it as part of the consideration for the land. And if this be true, then the origin of the Rawls title goes back, on account of the law referred to, to the time and fact of settlement, or at any rate to the date of that statute. It may be true that the right thus secured was not definitely fastened upon the two Rawls tracts until after they had been surveyed; but when that was done, in my opinion, those tracts of land were then segregated from the body of the public domain, and J. T. and W. W. Rawls had an equitable title in them. J. T. Rawls conveyed his tract to J. S. Smith on January 12, 1858, and on September 7, 1858, Smith conveyed it to Geo. Stiles to whom it was patented as assignee of J. T. Rawls. In the deed from Rawls to Smith it is stated that the land constituted J. T. Rawls' claim and location under the act of 1855 or 1856, granting land to actual settlers at 50 cents an acre, and it is also, in substance, stated that the land had been surveyed, the field notes returned to the land office, and the claim proven up. On January 25, 1858, W. W. Rawls conveyed his 160-acre tract to George Stiles, and the deed recites that the land had been surveyed; and it is further stated that Stiles is to pay the $80 that will thereafter fall due at the land office for the land. And it is also stated in the deed from Smith to Stiles that the Commissioner of the Land Office is to issue a patent to Stiles, upon payment by him of the amount due the state. It is further stated in said instruments that each survey was made by virtue of proof made under the act of the Legislature entitled, "An act to authorize the location and settlement of Mississippi and Pacific Railroad Reserve, passed August 26, 1856." These recitals being in George Stiles' chain of title, and both parties claiming under that title, and nothing being shown to the contrary, it must be held that the Rawlses were actual settlers upon their respective surveys, when the act of August 26, 1856, went into effect, and that their titles were founded upon their respective rights to such

lands, because of such actual settlement. It was also shown, by proof submitted by appellants, that George Stiles, subsequent to his marriage, paid to the state $81 due on each of the Rawls surveys, and the fact of such payments is satisfactory proof that both of those grants were based, in part, upon the fact that the Rawlses were actual settlers when the law opening the reservation went into effect, because that law, nor any other to which we have been referred, did not authorize any one, except actual settlers or their assigns, to purchase lands formerly within the reservation from the state. The law referred to authorized the acquisition of other public lands within that territory by the location of certificates or land scrip, but not by direct purchase from the state. This being true, and for the reasons above stated, in my opinion the Rawlses had a vendible interest in the lands which interest they sold to George Stiles; and, as he was at that time a single man, I feel compelled to hold that these lands became his separate property, although the payments subsequently made to the state consisted of community funds.

There is this feature of this case, which is entitled to consideration, and that is the fact that Stiles was compelled to purchase the Rawlses' claim, whatever may have been its character, in order to acquire a perfect title to the lands. As before said, the law had vested in the Rawlses as actual settlers an exclusive right to acquire full and complete title to these lands; and such right constituted an insuperable barrier in the path of Stiles, or any one else who attempted to acquire title to them. Now, according to the recitals in the deeds, Smith paid J. T. Rawls $85 for his title, and Stiles paid Smith $330 for the same title, and he paid W. W. Rawls for his title to the other tract $200. These payments were made before Stiles married, and therefore were made out of his separate funds. Thus it appears that, in order to acquire title to these lands, Stiles paid out of his separate funds $530, while the amount which was subsequently paid to the state out of the community funds was only $162. However, it is true that the lands were patented to Stiles as the assignee of the Rawlses, and that he has the same title they would have had if the land had been patented to them. But the facts recited afford at least a striking illustration of the proposition that the Rawlses had such a claim to the land as constituted an absolute barrier in the way of Stiles, or any one else who might desire to obtain it. So, while the $530 paid by Stiles for the Rawlses' claims to the land was not in fact a part of the purchase money paid to the state; it was a payment made for the purpose of acquiring prior claims to the land, which claims, in my opinion, constituted equitable titles, and therefore such payment should be considered part of the purchase money for the land.

The authorities bearing upon this question are reviewed in an able argument contained in the brief filed by counsel for appellees, which review and argument are adopted as part of my opinion, and are as follows:

"The contention of appellants that the deeds from W. W. Rawls and J. T. Rawls to George Stiles conveyed nothing, and were not the inception and origin of his title is met by the patents themselves, in which the grant in one is to him as the assignee of W. W. Rawls, and in the other as the assignee of J. T. Rawls. How can appellants be permitted to claim by and through these patents and yet deny their recitations? The equitable title of both W. W. Rawls and J. T. Rawls is recognized in the patents and for that title George Stiles paid a valuable consideration; one tract being purchased about 10 months before his marriage, the other about 2½ months. If this is the incipiency of Geo. Stiles' title, there can be no doubt that it belonged to his separate estate, as found by the court, and not to the community estate of himself and Zilpah Mullins, as contended by appellants.

"In the array of authorities presented by appellants no case can be found which, read in the light of the particular facts, will support their contention nor militate against the doctrine announced in Welder v. Lambert and Creamer v. Briscoe; i. e., 'When the origin of the title is in one of the spouses before marriage, it will be presumed that he or she paid it out with his or her individual estate.'

"Woods v. Durrett, 28 Tex. 430, holds that: 'A settlement and survey made upon vacant lands within the reserve (Mississippi & Pacific) at a time when the land was still reserved, could furnish to the party claiming under it no cause of action entitling him to judgment.' But in both deeds by the Rawlses it is recited that their claim and location is under the act of 1856, which, as the court judicially knows, opened this reservation to settlement. Previous to the act of 1856 the privilege extended by the seventh section of the act of 1854 to settlers on public domain was expressly limited to settlers upon land not then reserved from entry or location, and hence did not apply to lands in the Mississippi & Pacific Reserve.

"In Mills v. Brown, 69 Tex. 244 [6 S. W. 612], the land involved was a pre-emption, and the widow before marriage applied for a pre-emption of the land, paid the surveyor's fees, then married one Yarbrough, and afterwards moved on the land. It was held that the title did not originate in the widow, but that it was community property. Because the court says: 'Settlement upon the land is the first step towards obtaining the title, and without it no application for survey can be granted.' As no settlement was made on the land until after the marriage, her application and payment of surveyor's fees were mere nullities. But had she before marriage settled on the land, made her application, and paid the surveyor's fees, we apprehend there would have been a different result.

"In Webb v. Webb, 15 Tex. 274, the husband and wife moved to Texas in 1833, the wife died in 1834, and title was extended to the husband for the land in 1835. It appeared that the husband had selected the land prior to the wife's death. It was held that the land was part of the separate estate of the husband. The court in so holding says: 'The record of the statement of facts shows that the land had been selected before the death of the wife, but it does not show in what way it had been selected, whether by application to the commissioner or in any other way. It does not show that the requisite qualification of the applicant had been decided upon by the commissioners, or that anything had been done that was essential to the validity of the grant prior to the death of the wife.' But in the pending case essential steps had been taken by the two Rawlses; they had settled on the land and had it surveyed, and these essential steps are recited in the deeds which they subsequently made, and through which appellants trace title and are not permitted to deny. Likewise the patents recognize the Rawlses as assignors whose interests the state recognizes without question, and which interests were the foundation of the Stiles title. In Wilkinson v. Wilkinson, 20 Tex. 237, the court says: 'This case is clearly distinguishable from Webb v. Webb, 15 Tex. 275. In that case nothing had been done before the death of the wife upon the grant issued after her death to her husband. It was not shown that any legal steps had been taken before her death to secure the land or a title.'

"Appellants contend that the Rawlses had no vendible interest in the lands which they sold, and, as tending to sustain their insistence, cite Palmer v. Chandler, 47 Tex. 332. In that case the pre-emptor, before the expiration of three years which the law required him to reside upon the premises in order to acquire title, sold his claim to another, attempting to secure part of the selling price, as evidenced by a note, by a vendor's lien on the land. On consideration the court held there was no lien, and that when the pre-emptor abandoned and ceased to occupy the land he gave up and lost the inchoate right he had previously had to acquire it by continuing to occupy and improve it for the requisite time to entitle him to a patent. But in that case the pre-emptor had done nothing that availed his vendee in acquiring title. He had to occupy the land for three years, and the occupancy of his vendor counted for nothing. In fact the vendee acquired the land in his own right, unaided by any act of his vendor. The reverse is true in this case, where the settlement of the

Rawlses, the survey of the two tracts of land, and the filing of the field notes, are matters essentially necessary to the acquisition of title, and, having been done by the Rawlses, are not required of Stiles, who acquired these rights from them.

"Williams v. Finley, 99 Tex. 468, 90 S. W. 1087, is also cited by appellants, where it was held that when the vendor had valuable improvements on the land sold, so that he was entitled to compensation therefor, but the paramount title was in the state, so that the purchaser was obliged to purchase, not only the title from the state, but to reside on the land for three years in order to acquire title under statutes relating to the disposal of state land, the vendor was entitled to recover of the purchaser only the sum by which the improvements placed on the land by him increased the value of the land. The following excerpt from the opinion will show that the principle there invoked has no reference to cases of this character: 'Many decisions of this court have dealt with cases in which persons have contracted to purchase or become tenants of lands supposed to belong to those selling or renting, but which in fact were part of the public domain, subject to appropriation by themselves as homesteads or pre-emptions, and have, on discovering the truth, asserted the right affirmatively given to them by the statutes to acquire the title.' In such cases the contracts of sale are held to be without consideration, as the vendor had no vendible interest in the title; his interest being restricted to the improvements. But there was no mistake in this instance, and the Rawlses, by their acts in compliance with the statutes, had secured legal and valuable rights, which they conveyed to Geo. Stiles, who, by virtue of his rights thus acquired, afterwards procured patents to the land.

"In Lamb v. James, 87 Tex. 486 [29 S. W. 647], the vendor James was not lawfully in possession of the land which he attempted to convey to Lamb, and from this conveyance, the latter received no benefit. Such being the facts, the Supreme Court in passing on the case say: 'The possession of the vendee cannot ripen into a right, nor will it give him any advantage in dealing with the state. His wrongful possession will not preclude an actual settler from moving onto the land under contract with the government, for it can confer on him no right of action or defense.' But the possession which Stiles received as the vendee of the Rawlses did inure to his benefit, and but for it he could not have acquired the legal title.

In Rayner Cattle Co. v. Bedford, 91 Tex. 642 [44 S. W. 410, 45 S. W. 554], the rule announced in Lamb v. James, is reiterated. In Simpson v. Oats [102 Tex. 186], 114 S. W. 105, where the husband and wife resided on the land at the time of her death under the mistaken belief that they had acquired title from another, when in fact the land was part of the public domain, the wife dying before the husband had taken any steps to comply with the law for acquiring the land, it was held that it was the separate estate of the husband, and not community property. The court says in the opinion: 'This case is distinguishable from Creamer v. Briscoe in the fact that in that case all the steps necessary to secure the land had been taken before the wife died except the occupancy of three years, which had been commenced, and only required to be completed to give title. The very things—survey and return of the field notes—which determined in that case that the property was community, are absent in this, and their absence determines that the land was not community property of J. W. and Hannah Ripley.' The very things—survey and return of the field notes—which were decisive in Creamer v. Briscoe appear in this case, and no stronger citation against the contention of appellants can be found.

"Gafford v. Foster [36 Tex. Civ. App. 56], 81 S. W. 63, is a case in which the husband and wife were living on land to which they had no title. The wife died before limitation had run in their favor. The husband continued to live on the land after the wife's death until the bar was complete and it was held that the wife acquired no interest, the court remarking: 'There are any number of authorities to the effect that, when a right to property is acquired during marriage, such property will belong to the community, even though the wife dies prior to the completion of the title. This is so in bonds for title to property or other contracts of purchase, bounty warrants, land certificates, and the like; but in all these cases a legal right exists in favor of the community which may be asserted against the world. This is not true in the case of one who attempted to acquire by limitation. He has only the chance of obtaining title by being permitted, unmolested, to hold the land for the prescribed time.' We presume it will not be denied that the title acquired by Geo. Stiles from the Rawlses was one that he could have asserted against the world. Even the state could not defeat this title, if he proffered the 50 cents per acre within the time allowed; his vendors having already taken the initial legal steps.

"Clark v. Altizer, 145 S. W. 1041, decided by this court, does not lend support to appellant's theory, holding as it does that a purchaser of school land from the state, who sells within less than one year from the date of his purchase and settlement, forfeits the land and his payments to the state. But this holding is based on the act of the Thirtieth Legislature (1st Ex. Sess. c. 20, par. 6), and but for the legislative enactment the court holds, as we understand, the original purchaser had a vendible title, though he had not completed his three years' residence on the land. Aside from the statute, we understand the court to hold: 'Where school lands

were legally awarded by the state, a substitute purchaser acquired a vendible title, which was a sufficient consideration to support notes given for the purchase money therefor, and a mortgage given to secure the same, though the three years' occupancy prerequisite to the issuance of final title by the state had not been completed.' Certainly, no case can be found more strongly sustaining the theory of appellees."

### On Motion for Rehearing.

JENKINS, J. [1] The able presentation of the view of this case adverse to that entertained by the majority of this court, set forth in the dissenting opinion of Mr. Chief Justice KEY, as also the zeal and evident sincerity with which learned counsel for appellees have presented their motion for a rehearing, constrain us to write an additional opinion herein.

Mr. Chief Justice KEY, in the opinion referred to, places much stress upon the fact that it has always been the policy of this state to encourage the settlement of its lands. True, but it has never been the policy of this state to encourage persons to occupy lands which it has granted or reserved to others. Such were the lands in controversy when the Rawlses settled upon them. They were in the Mississippi and Pacific Reservations, and locations upon them by pre-emptors or others were contrary to law and void. Sherwood v. Fleming, 25 Tex. Sup. 408; Woods v. Durrett, 28 Tex. 430. This would seem to be a sufficient answer to the argument as to public policy; but it may be further observed that the act of 1856, opening this reservation to sale, does not require settlement as a condition of purchase, and does not require continued settlement by those who were given preference rights to purchase, nor even that they should be settlers on the land at the date of such purchase, but only that they should have been such settlers when the law was passed. Gammel's Laws of Texas, vol. 4, p. 474.

[2] Did the Rawlses have any title to the land in controversy? If not, they could convey none. It is well settled that an occupant of public land can convey no title, if he has none himself. Wheeler v. Styles, 28 Tex. 240; Rodgers v. Daily, 46 Tex. 578; Palmer v. Chandler, 47 Tex. 332; Swetman v. Sanders, 85 Tex. 294, 20 S. W. 124.

[3] Title to land may be acquired by gift, devise, inheritance, limitation or purchase. None of these methods could apply to the Rawlses except the latter. Did they ever purchase these lands? If so, when? It has frequently been said that whether land be separate or community property will depend upon whether the owner was married or single at the inception of his title. What is meant by "inception of title"? Title means ownership, either equitable or legal. Equitable ownership means a present title in land which will ripen into legal ownership upon the performance of conditions subsequent. Inception of title is title. It is the beginning of a contractual relation which entitles a party to the land upon compliance with his part of the contract. But there must be a contract, express or implied, by which two or more parties, for a valuable consideration, have agreed to do or not to do some particular thing. A mere offer, before acceptance, or a gratuitous promise is nudum pactum, and not a contract.

All lands acquired under the colonization or pre-emption laws of this state were acquired by contract of purchase; the price paid being the settlement of the land and such occupancy as the law required. The improved social conditions and increase of taxable values were deemed by the state adequate consideration; and in many cases, as was said in Yates v. Houston, 3 Tex. 455, "these grants were, in fact, dearly purchased by the unparalleled * * * sufferings" of the settlers. Keeping in mind that these grants were purchases will furnish the key to the decisions as to the inception of title to such grants. The pre-emption laws were propositions on the part of the state to grant a certain number of acres of land to all who would become settlers on public domain, and reside thereon for three years. The proposition was accepted by settlement on the land. That closed the contract, made the first payment, and the settler acquired at that time an equitable title to the land. It was necessary to follow such settlement by survey and three years' occupancy, in order to obtain a patent, just as it is necessary, where land is purchased on a credit, to make the promised payments. Also under the colonization laws, the state offered to sell the land to the colonist in consideration of his settlement. Hence in Mills v. Brown, 69 Tex. 244, 6 S. W. 612, Creamer v. Briscoe, 101 Tex. 400, 109 S. W. 911, 17 L. R. A. (N. S.) 154, 130 Am. St. Rep. 869, Porter v. Chronister, and Wilkinson v. Wilkinson, the land was held to be community property, because the contract of purchase was closed, the first payment was made, and the equitable title was thereby vested during the marriage state. The subsequent payment of the remainder of the purchase money, by completing the settlement, after the death of the wife, did not give title, but only perfected the title already acquired. This is why the subsequent payment of the purchase money, or performance of condition, is said to relate back to the inception of the title. In other words, title is acquired when the contract of purchase is closed; it is perfected when final payment is made and an absolute conveyance is executed, or a previous conditional conveyance becomes absolute, by compliance with its terms.

No contract for the sale of land is made until a purchaser has accepted the terms of the contract *in their entirety*, and thereby expressly or impliedly agreed to comply with

all of the terms proposed by the seller. If the terms be cash, the purchaser must tender the full amount in cash. If the terms be upon a credit, in whole or in part, he must agree to make the payments at the stipulated time or times. If the sale be upon a credit, an equitable title is acquired when the contract is closed. The failure of the purchaser to comply with the terms may cause him to lose his equitable title, but it does not change the fact that he had such title.

The fact that the terms upon which it is proposed to vest title must be fully complied with—that is the conditions precedent must be performed, and there must be a promise to perform the conditions subsequent—is illustrated in the acquisition of title by limitation. In such cases the state agrees that whoever may take possession of lands and continue such possession, under the conditions and for the time mentioned in the statute, shall have title to such lands. A man takes such possession and continues the same for a portion of the period during the lifetime of his wife, and completes such occupancy after her death. The title acquired is not community property. Bishop v. Lusk, 8 Tex. Civ. App. 32, 27 S. W. 306; Gafford v. Foster, 36 Tex. Civ. App. 57, 81 S. W. 63. Here the inital service was performed during the lifetime of the wife. Why was the land not community property? Because it was not "acquired" by taking possession of and living on it a part of the time. The possession was not taken under contract, and, being unlawful, there was no implied promise to continue such occupancy for the period required by statute. Hence, until the full period required by statute is completed the occupant "will have acquired no interest, either legal or equitable, in the land." Bishop v. Lusk, supra.

Again we ask, when did the Rawlses acquire title? When and how did their title begin? The proposition of the state to sell to them was contained in the second section of the act of 1856, which reads as follows: "That all persons who are now settled upon any portion of the said reserve belonging to the state, shall pay fifty cents per acre for his or her claim not to exceed one hundred and sixty acres, and the said parties are hereby required to have their lands surveyed by the district or county surveyor, and the field notes returned to the General Land Office by the first day of January, A. D. 1858, provided that all persons now resident on said reserve shall, on or before the first day of January, A. D. 1858, pay over to the Commissioner of the General Land Office the said amount of fifty cents per acre, for the amount of their claims. And the Commissioner is hereby required to patent the surveys authorized by this section as other surveys." The Rawlses could have acquired title under this act only by complying with all of its terms. What were these terms? That they should have the lands surveyed, the field notes re-

turned to the land office, and pay 50 cents per acre before the 1st day of January, 1858. By amendment, the time for returning the field notes was extended to April 30, 1859, and the time for payment to October 1, 1859. The terms were not that they should do one or more of these things and promise to do the others, but that they should do all of them within the time prescribed. J. T. Rawls sold to James Smith, on January 12, 1858, and W. W. Rawls sold to Geo. Stiles on January 25, 1858. At the times of these sales, the lands had been surveyed, and the field notes of the J. T. Rawls had been returned to the land office, but no money had been paid. Smith sold to Stiles September 7, 1858; still no money had been paid, and none was ever paid until it was paid by Stiles, nearly a year after his marriage. Hence neither the Rawlses nor their assignee complied with the terms proposed until after Stiles' marriage. In other words, the proposition of the state to sell said lands was not accepted by the Rawlses or Smith, and not by their assignee Stiles until after his marriage.

Did the Rawlses or Smith ever acquire any right in these lands? "A right is something which may be asserted in the courts as a basis for cause of action or defense." Gafford v. Foster, supra. Suppose the state had been suable, and the Rawlses had brought suit against the state to recover title on the day they sold. The court would have said to them: "The terms upon which you were to have title to these lands have not been complied with, and hence you have no title, legal or equitable." But they might have said: "We have had the lands surveyed, and we intend to have the field notes returned and make the payment within the time allowed us." The reply would have been: "The state did not offer to sell you these lands upon condition that you would have them surveyed and *promise* to return the field notes and pay the purchase money in a given time, but only on condition that you first do these things. Your good intentions cannot take the place of performance of the conditions precedent." While having the lands surveyed indicated a purpose to pay for them, it was not in fact a promise, express or implied, to do so.

What did the Rawlses have at the time of their sales? Only a preference right to purchase. Let it be kept in mind that this preference right to purchase for a fixed time was not a sale upon a credit for such time. This time was given in which the Rawlses could elect whether or not they would purchase at all. We do not think such exclusive privilege to purchase constituted title of any character.

The Constitution of the Republic of Texas (section 10, General Provision) gave citizens then in Texas a preference right to locate the lands to which they were entitled, so as to include their improvements. This right was declared to be assignable. The act of

1837 (Laws 1837, p. 222) gave them six months' preference right in which to exercise this privilege.

In Edgar v. Galveston Co., 21 Tex. 330, the court said: "From these provisions it appears that settlement gave no right, but only a preference." The improvement did not give a right to the land. The occupancy which gave a preference under the Constitution is not a fixed right to land, which arises under a pre-emption settlement which in itself is the moving cause of the grant to the identical land.

In Patton v. Skidmore, 19 Tex. 539, 540, the court said: "The six months' preference given was a virtual reservation of the land from general location, for the benefit of those residing on vacant land, who might wish to secure titles to their homes. * * * Compliance with the terms prescribed was a condition precedent to the acquisition of title. * * * It was at his option to exercise his privilege or not. * * * Nothing short of actual compliance with the terms and conditions of the law could confer on the occupant a right, or raise an equity, as against the government or third persons."

In Simpson v. Oats, 102 Tex. 188, 114 S. W. 106, Mr. Chief Justice Brown, speaking for the court said: "The fourth section of said act provides as follows: 'Any person now occupying any part of the public domain of the state in good faith, shall have the right to take the necessary steps, at any time within twelve months from the passage of this act, to appropriate the same, or a part thereof, to a homestead under the first section of this act, or to purchase the same, or a part thereof, under the third section of this act.' That law gave to Ripley the preference right for 12 months from August 12, 1870, to have the land he occupied surveyed and field notes returned into the General Land Office, but in order to acquire it as a homestead, he was required to reside upon the land three years from that time. *His previous occupancy of the land counted for nothing, except to secure to him the preference right for 12 months to appropriate the land for a home.* The only right which existed at the time af Mrs. Ripley's death was the preference, secured by the statute. *Ripley had no property right in this land at that time;* therefore the land which was acquired after her death by his action in complying with the statute and his residence upon the land was his separate property." (Italics ours.)

In Simpson v. Oats, supra, the land was held to be the separate property of the husband because no survey was made in the lifetime of the wife. In Mills v. Brown, supra, the fact that a survey was made before marriage was held not to constitute the land separate property. No conflict will be found in these decisions when examined in the light of their respective facts. In Mills v. Brown, the settlement was the thing required to close the contract with the state. In Simpson v. Oats, no settlement was required, because it had already been made. The act under which the land was patented was not passed until two years after such settlement. The only thing required of Ripley under said act was to have the land surveyed and the field notes returned to the land office within 12 months from the passage of said act, and to occupy it for three years thereafter. All of these things he did after the death of his wife. At the time of his wife's death he had a preference right to acquire the land in the manner he afterwards did acquire it; but, as said by the court, this preference right gave him "no property right in this land at that time." A right in the land as it is called in Creamer v. Briscoe, 101 Tex. 493, 109 S. W. 911, 17 L. R. A. (N. S.) 154, should be distinguished from the privilege of acquiring such right.

The survey of these lands for the Rawlses bears no analogy to a survey made by virtue of a land certificate. A land certificate was the written promise of the state, for a valuable consideration, to grant to the holder thereof the number of acres of land mentioned therein when selected by him; such selection to be made by an official survey. It was the purchase money paid to the state for the land granted. A land certificate was a floating equity to land, which became fixed when the survey was made. "The holder of it had no claim to any particular portion of the public lands, but a general lien upon all the lands, to be satisfied out of such portions as were unappropriated at the time he made his selection or location." State v. Delesdenier, 7 Tex. 98. The certificate was the purchase money; the survey was the purchase. A survey made by virtue of a land certificate was declared by statute to constitute title to land. Paschal's Dig. art. 5303. The Rawlses' preference right to purchase was assignable, but they could assign no more than they had, which was only a privilege to purchase. This privilege may have been valuable, but it was not title to land. Palmer v. Chandler, 47 Tex. 335.

Appellees rely upon the case of Manchaca v. Field, 62 Tex. 135, and Welder v. Lambert, 91 Tex. 510, 44 S. W. 281. In the former case the special judge who rendered the opinion said: "There is much force in the argument" that a license to purchase is not equitable title to the thing subsequently purchased, "and it finds an apparent sanction in Webb v. Webb, 15 Tex. 274, Walters v. Jewett, 28 Tex. 192, and in perhaps other decisions of this court; but the later decisions and the weight of authority seem to favor the proposition of appellants, that the concession, having a money value, and being the subject of sale, was property in which Mrs. Sanches had a community interest which descended to her heirs at her death, and which attached to the grant subsequently ex-

tended." The only cases or authority cited in support of this opinion are Porter v. Chronister, 58 Tex. 54, Wilkinson v. Wilkinson, 20 Tex. 244, and Yates v. Houston, 3 Tex. 452. Neither of these cases support the proposition announced in the above excerpt. Chronister was a colonist in Peters Colony. The state guaranteed to each family who settled in said colony 640 acres of land, even though the promoters failed to carry out their contract. Act Feb. 4, 1841 (Laws 1840–41, p. 173) § 12. The act of January 21, 1850 (Laws 1849–50, c. 51), authorized patents to be issued to each head of a family as compensation of such settlement (section 1 of said act). Chronister "applied for and secured a certificate for 640 acres of land, by reason of the immigration and settlement of himself and family." In Wilkinson v. Wilkinson all of the conditions necessary to entitle the head of the family to an unconditional certificate were performed in the lifetime of the wife. In Yates v. Houston the issue was as to whether the reputed wife was to be considered, for the purposes of that case, the legal wife. The immigration, location, and issuance of patent all occurred during the lifetime of both husband and wife.

The rights of the parties in Manchaca v. Field, supra, and in Welder v. Lambert, 91 Tex. 510, 44 S. W. 281, were determined under the Spanish law. But not so in the instant case. It is true that our statute as to community property drew its inspiration from the civil law, but it is our statute, and not the civil law, which governs here. Routh v. Routh, 57 Tex. 596.

The interpretation of the civil law in Welder v. Lambert is based upon the case of Barbet v. Langlois, 5 La. Ann. 215. It appears that the right to purchase the land in rear of the river grant was not treated as a gratuitous offer by the government, but as part of the contract under which the front tract was acquired. That portion of said decision in the French language, when translated, reads as follows: "The property acquired by husband or wife is community property only when the title or cause of its acquisition was not antecedent to the period of their community (partnership); otherwise it is the individual property of the members of the community (partnership). * * * For it is not the supplemental payment which I made of the just price which constitutes my title of acquisition; it is the sale which was made to me before my marriage. According to the Code, property is transferred by the contract of sale (1583); but the promise to sell is as binding as the sale, according to article 1589; that is to say the promise to sell compels him who made it to enter into the contract of sale. However, the promise to sell does not transfer property, as the contract does. Thus he to whom the promise was made is not the owner before the contract is drawn; but, as his right to compel the promisor to enter into the contract with him is antecedent to the marriage, the inherited property will not become community property, except for compensation. For the same reason, if the relative from whom I inherit had sold some property with the privilege of buying back, and if after his death, acting as his heir, I have used this privilege of buying back, I am supposed to have this property (inheritance) as a succession from my relative; although I did not find the property (inheritance) itself in the succession, it is sufficient that I found in it (the succession) the right of buying back, which was exercised in this property (inheritance) which I bought back; this inheritance is consequently my own property, both in the matter of succession and individual property of (the member of) the community, except the compensation which I owe to the community, for the sum which I drew from it to avail myself of the right of buying back. Pothier Community, 116."

[4] The phrase "cause of its acquisition," when taken in connection with the other parts of the quotation, means the contract of acquisition. The instances mentioned in the translations made by the court in Welder v. Lambert are title under a will, a deed where the purchase was on a credit, and the redemption of an equity. A will and a deed are muniments of title. They convey title, though such title may be defeated by conditions subsequent. "An equity of redemption is an interest in the land mortgaged which will descend to the heir of the mortgagor, who in legal contemplation continued to be the owner of the land." "An equity of redemption is considered to be the real and beneficial estate, tantamount to the fee at law." Words and Phrases, vol. 3, p. 2447.

In support of our statement that the Supreme Court of Louisiana treated the right to purchase the lands in the rear as an implied part of the contract under which the river front was acquired, we quote from the opinion in Barbet v. Langlois, as follows: "By the act of 1811, every person in Louisiana who owned a tract of land bordering on a river, creek, bayou, or water course was entitled to a preference right in becoming the purchaser of the vacant land adjacent to and back of his own tract to a depth of 40 arpens. * * * This legislation was founded upon a just respect for the usage, which existed under the French and Spanish governments, of granting, on application of the proprietors of land fronting on a river or bayou, what was called a 'double concession.' * * * It was not so much a pure liberality on the part of the United States, as a just fulfillment of the reasonable expectation which the grantee under the ancient government had been encouraged to entertain when he went forth to subdue the wilderness." Not so, however, in the instant case. The Rawlses had not been encouraged to go upon

this land, but had been expressly forbidden by law so to do. The act of 1856 was not in just fulfillment of a reasonable expectation which they had been encouraged to entertain, but a pure act of grace on the part of the state to relieve them, and others like them, of the consequences of their own folly in improving land which they knew was reserved from settlement. The court in Barbet v. Langlois treated the right to purchase the rear tract as a sort of appurtenant to the front tract, arising from the custom of the French and Spanish governments of granting double concessions. But as no promise, express or implied, was held out to the Rawlses that in consideration of their settling on this land they should have a preference right to purchase it, we do not think that such privilege to purchase should be held to be title to land, nor, until accepted, the beginning of title.

It seems to have been held in Welder v. Lambert that the mere privilege of purchasing land, acquired before marriage, would constitute land purchased under said privilege after marriage separate property. If such be the case, a concession to fish in certain waters, granted before marriage, would make fish taken in such waters after marriage separate property. Such would not be the case under our law.

Whatever may have been the Spanish law with reference to a mere privilege to purchase, the correct conclusion seems to have been reached in Welder v. Lambert upon the facts of that case. Power and Hewitson had a colonization contract by virtue of which, upon the performance of the contract, they were entitled to certain lands. This written contract conveyed equitable title. It was made and partly performed before Power's marriage. The patent issued after the completion of the contract and subsequent to his marriage, was held to relate back to the date when the equitable title was acquired. This is not essentially different from the case where a party buys a tract of land before marriage and pays part of the purchase money, taking a bond for title, or deed, with vendor's lien retained, and finished payment and takes deed or release of the lien after marriage. In such case the land is separate property, for the reason that *title* was acquired before marriage, though *perfected* after marriage. Powers had "la accion" under the Spanish law, and an equitable title under the common law, at the time of the execution of the contract; and, "when the condition was accomplished, it referred back to the time of the making of the contract, and is considered as made at that time." In the instant case, there was no contract until Stiles, as assignee of the Rawlses, accepted the state's proposition to sell the land, which, as above stated, occurred after his marriage.

Believing that this case has been correctly decided by this court, appellees' motion for a rehearing is overruled.

158 S.W.—65

KEY, C. J. (dissenting). Further consideration of this case on appellee's motion for rehearing has confirmed me in the views heretofore expressed, and, as the majority of the court has filed an additional opinion, I deem it proper to make some additional observations myself.

As appears from the former opinions, the controlling question in the case is whether or not the land involved was the separate property of George Stiles, or the community property of himself and his wife. Both the majority opinions seem to lay stress upon, and cite authorities to show, that when the law requires certain things to be done within a designated time in order to obtain a complete title from the government, the failure to perform any portion of what is required within the time specified is fatal to the claim, and therefor the alleged title is invalid. Patton v. Skidmore, 19 Tex. 540, and Edgar v. Galveston Co., 21 Tex. 330, cited in the opinion of Mr. Justice Jenkins, as well as several cited in the opinion of Mr. Justice Rice, belong to that class, and announce a doctrine not disputed by me; and in the latter case it is said: "The right of the plaintiff to the land, if any he ever had, was lost by his neglect to file his application for survey within the proper time." That language implies that at one time the plaintiff may have had an equitable title to the land.

Also the last majority opinion gives an illustration as to title acquired by limitation, to the effect that when the adverse possession begins during coverture and is completed after the death of the wife, the title thus acquired by limitation becomes the separate property of the husband; and, in support of that proposition Bishop v. Lusk, 8 Tex. Civ. App. 32, 27 S. W. 306, and Gafford v. Foster, 36 Tex. Civ. App. 56, 81 S. W. 63, are cited. The reverse of that proposition was held by the Galveston Court of Civil Appeals in Texas & N. O. Ry. Co. v. Speights, 59 S. W. 572, and Alford & Whitesides v. Williams, 41 Tex. Civ. App. 436, 91 S. W. 636. That identical question does not appear to have been passed upon by the Supreme Court, but in the case of McClintic v. Midland Grocery & Dry Goods Co. (Sup.) 154 S. W. 1157, decided during the present term, that court cited with apparent approval Alford & Whitesides v. Williams. In 3 King's Conflicting Cases, §§ 68, 154, 260, it is stated that Bishop v. Lusk, Gafford v. Foster and several other decisions cited in the note to section 260 are, in effect, overruled by Creamer v. Briscoe, 101 Tex. 490, 109 S. W. 911, 17 L. R. A. (N. S.) 154, 130 Am. St. Rep. 869, and it is there said: "The decision of the Supreme Court in the Creamer Case, being the latest expression of that court, must be construed as overruling not only the Votaw Case [15 Tex. Civ. App. 87, 38 S. W. 215], but also Buford v. Bostick [58 Tex. 63]; Roberts v. Trout [13 Tex. Civ. App. 70, 35 S. W. 323]; Bishop v.

Lusk, Mitchell v. Nix [1 Posey, Unrep. Cas. 126], and Gafford v. Foster. "Then it must follow that where the wife dies before the three years' occupancy has been completed, the title to the homestead donation is in the community; and, when the wife dies before the bar is complete under the three, five, or ten years statute, it is likewise community." And in that excellent compilation, the American & English Encyclopædia of Law (volume 6, p. 325) the text reads: "But when the prescription begins before and ends during the marriage, the title takes effect as of the time when the prescription begins, and is therefore separate property."

It is also to be noted that in the last majority opinion seemingly an effort is made to discount and break the force of the decisions made by the Supreme Court in Manchaca v. Field, 62 Tex. 135, and Welder v. Lambert, 91 Tex. 510, 44 S. W. 281. As to the former it is stated that the opinion was rendered by a special judge, and an effort is made to show that it is not supported by the decisions cited by him in support of the conclusion there reached; and it is finally stated that in that case, and in Welder v. Lambert, the Spanish law as to community property was involved, while the case in hand is controlled by our statute upon the subject. As to the first criticism of the Manchaca Case, it is sufficient to say that a judge is a judge, and it is immaterial whether his time of service be long or short—his powers and authority are the same. As to the other criticism against that case, if it is not supported by the decisions therein cited, it is approved by the subsequent case of Welder v. Lambert, where it is extensively quoted from by Chief Justice Gaines, and by McClintic v. Midland Grocery & Dry Goods Co., supra, which involved our community statute.

Nor is it believed that there is any merit in the distinction sought to be drawn from the fact that Manchaca v. Field and Welder v. Lambert, involved the Spanish law, while the case at bar comes under our statute regulating community and separate property rights. Both systems of law have what are designated "community property rights"; and, while it is admitted in the majority opinion that our statute upon that subject drew its inspiration from the civil law, it seems to be contended, without pointing out any reasons therefor, that the same construction placed by our Supreme Court upon the Spanish or civil law, in determining what constitutes the origin or inception of title, should not be placed upon our statute regulating community property. To my mind the analogy is obvious, and the rule which applies to one class should apply to both; and in that view I am supported by declarations of the Supreme Court in Creamer v. Briscoe and McClintic v. Midland Grocery & Dry Goods Co., supra. In the former case, which involved a construction of our community statute, the Supreme Court said:

"Mills v. Brown," which involved our community statute, "fully recognizes as applicable to such cases the principle, more fully discussed afterwards in the case of Welder v. Lambert, 91 Tex. 510 [44 S. W. 281], that the character of title to property, as separate or community, depends upon the existence or nonexistence of the marriage at the time of the incipiency of the right in virtue of which the title is finally extended, and that the title, when extended, relates back to that time." Thus it will be seen that the Supreme Court treated the principle in the two classes of cases as identical; and in the McClintic Case the court said: "In a controversy like this, to which the state is not a party, involving an issue as to whether public land purchased from the state in the name either of husband or wife is community property or separate property, the status of the property must be determined by the character of the right by which the title thereto had its inception. Such, it seems, was the rule under the Spanish law; such has been the rule under the Revised Civil Code of Louisiana, in which state the community system prevails; and such is the rule under the statutes and decisions of this state. Welder v. Lambert, 91 Tex. 510 [44 S. W. 281]; Sparks v. Taylor, 99 Tex. 411 [90 S. W. 485, 6 L. R. A. (N. S.) 381]; Creamer v. Briscoe, 101 Tex. 490 [109 S. W. 911, 17 L. R. A. (N. S.) 154, 130 Am. St. Rep. 869]; Ullmann v. Jasper, 70 Tex. 446 [7 S. W. 763]; Manchaca v. Field, 62 Tex. 135; Mills v. Brown, 69 Tex. 244 [6 S. W. 612]; Alford & Whitesides v. Williams, 41 Tex. Civ. App. 436, 91 S. W. 636; Allen v. Allen, 101 Tex. 362 [107 S. W. 528]; Miller v. Odom, 152 S. W. 1185." So it appears from former decisions, and from the last utterance of the Supreme Court upon the subject, that the distinction sought to be made in the majority opinion does not exist; and therefore Manchaca v. Field and Welder v. Lambert are as much authority in this case as Mills v. Brown and Creamer v. Briscoe.

In the case at bar the majority of the court seem to concede that if the Rawlses had any right to their respective tracts of land at the time they conveyed them, then, as Stiles acquired those rights while he was a single man, the lands in controversy were his separate property, although the consideration thereafter paid to the state may have been community property. Their contention is that the inception of the Rawlses' title was the payment to the state of the purchase money, and that nothing behind that fact can be looked to in determining whether the land was the separate property of Stiles or the community property of himself and his wife. That position involves the contention, clearly presented in the last opinion, that the act of August 26, 1856, and what had been done by the Rawlses in pursuance of that act at the time they undertook to sell the land, vested in them no right to the land;

and the logical result of that contention would be that at the time they attempted to sell the lands they had no right to the possession and use of them as against the state or anyone else.

My position is that when the statute went into effect, or, at any rate, as soon as they accepted its terms by making proof of their occupancy, having the land surveyed and returning the field notes to the land office, they had a vested contract interest in the lands, which was a property right constituting an equitable title, which they could alienate, and which was binding upon the state; and, in support of that proposition, reference is made to Ryan v. Jackson, 11 Tex. 391, and Manchaca v. Field, supra. In both of those cases the Supreme Court was called upon to determine the rights of colonists who had obtained concessions under the colonization law of March 24, 1825 (Laws of Coahuila & Texas, p. 15). That law permitted colonists to purchase lands at certain specified prices, and required a would-be purchaser to first make the necessary proof before a proper officer and obtain a concession, which was nothing more than an official proclamation or certificate, stating that the person designated had made necessary proof to become a purchaser, and that he was granted the right to select the quantity of land referred to within the territory specified in the concession, and the proper officer was directed to put him in possession, etc. The law did not require the land to be paid for until after it had been selected and surveyed, and even then it was within the discretion of the officer making the sale to sell for cash or on time; and in the Ryan-Jackson Case, the Supreme Court said: "We are aware of no provision of law which forbade the grantee, who acquired by purchase under the twenty-fourth article of the law of the 24th of March, 1825, to sell so soon as he had obtained his concession, and before the final title was issued. It is a right which would appertain to the grantee on general principles. The right of property in the concession includes the power of disposition, subject only to such restrictions and qualifications as may be imposed by law. Where the law imposes no restriction, the power is absolute, and there does not appear to have been any restriction upon the power of alienation imposed by the law in this case, except that contained in the twenty-seventh article, that the purchaser should be obliged to perform the condition of cultivation."

In Manchaca v. Field, supra, it was held that when a colonist was a married man at the time he procured his concession under the act of March 24, 1825, the land subsequently acquired by virtue of that concession was community property, although his wife died soon after he obtained the concession and before the purchase money had been paid, or anything else done looking to the ac-quisition of the land. In that case, while it was not done, the court might have cited Ryan v. Jackson in support of the holding that the concession vested in its holder a property right which could be the subject of sale. The analogy of those cases is this: The concession issued to the colonist constituted his right to make a selection of a certain number of acres of land within a certain territory and buy the same from the government at the price fixed by the law. In the case at bar the statute of August 26, 1856, had as much force and effect as a concession issued under the colonization law of 1825, because it, in terms, authorized each settler to buy, and, in effect, offered to sell to him 160 acres of land to be selected by him so as to include his improvements. This law of itself was certainly equivalent to a concession under the law of March 24, 1825; and, following the rule announced and applied in Ryan v. Jackson and Manchaca v. Field, supra, it seems that the Rawlses had an assignable interest in the land, even before they took any steps looking to a further selection and designation. But it appears from the recitals in the Stiles chain of title that they had made proof of their occupancy, caused their lands to be surveyed, etc., and had thereby applied the statute of August 26, 1856, to the identical lands now in controversy, and which, after having them so surveyed, they conveyed to Stiles.

Thus it seems clear to me that at the time the Rawlses conveyed the land they had a contract to purchase it from the state, which contract was binding upon both parties, and constituted a property right in reference to the land, which right they could and did sell; and, by virtue of such sale, as is shown on the face of the patents, the two tracts of land were granted by the state to Stiles. In purchasing the Rawlses title Stiles not only acquired whatever rights the Rawlses had to the lands, but he assumed the payment to the state of whatever amount might become due to it, as shown by stipulations in the deeds by which he acquired the Rawlses' title; and the state could have maintained a suit against him and recovered the purchase money upon his written promise therein to pay the same, although such promise was not made to the state. Spann v. Cochran & Ewing, 63 Tex. 240.

With due respect to my Associates, I believe they have failed to apprehend the full purport and meaning of the statute of August 26, 1856, and the distinction made by the Supreme Court in Welder v. Lambert and Creamer v. Briscoe, supra. In the latter case the distinction is clearly pointed out by Mr. Justice Williams, in which, after making a quotation from Buford v. Bostick, 58 Tex. 63, where the court said that a pre-emption claim, until perfected, is not a title defeasible upon the nonperformance of conditions subsequent, but is a mere inchoate right which

may ripen into a perfect title upon the performance of certain conditions precedent, etc., it is said: "This characterization of the right of a homestead or pre-emption claimant as against the state may be correct enough, and the question whether or not such a claim to land is title or color of title under the statute of limitations may depend upon its legal standing as between the claimant and the state. But when the question is one between the husband and wife as to their respective rights, other considerations should control, and are made to control, by the reasoning in Mills v. Brown. "It is not correct to say that a husband and wife, who have settled upon public lands under the law giving them the right to occupy and improve it and eventually to obtain title by such occupancy and improvement, acquire no right prior to the running of the prescribed time. It is true that they do not acquire a complete title, legal or equitable, until they have possessed for such time, but it does not follow that they do not acquire a right in the land which afterwards merges in and determines the character of the title. From the time of the initial steps, the settlement, they have the right to hold and use the land as owners against any one but the state, and against the state at least so long as they comply with the law and it remains unchanged. They are authorized to sell their claim and the purchaser becomes entitled to take possession, to complete the occupancy and to acquire the title. It would hardly be contended that the price of such a sale would not be community property. And, perhaps, we hazard nothing in saying that, if it should become necessary for a court, upon separation of the husband and wife, to partition their property between them before the expiration of the three years, the land held by them under such a settlement would have to be taken into account as their joint property, and their rights with respect to it adjusted in some appropriate way. It is evident, therefore, that they do acquire rights of property in or with respect to land so held even before they have entitled themselves to a patent from the state." In that case the property was acquired under a pre-emption law which required occupancy for a specified time, and did not require the payment of any money for the land. There settlement, survey, and return of the field notes were the initial steps; and it is stated in a previous part of the opinion that Creamer and his wife had settled upon the land as a homestead donation, and had done everything necessary to that end, except to complete the three years' occupancy, and therefore it was held that the marital status of the settler at the time the survey and settlement were made would determine whether the property was separate or community.

In the case at bar, and in reference to the land here in controversy, no one could purchase it from the state by paying 50 cents an acre for it to the Commissioner of the Land Office, as was done in this case, except the person who was an actual settler upon it at the time the act of August 26, 1856, went into effect, or the vendee of such settler; and therefore the inception of the title was the passage of the statute referred to, and the fact that the Rawlses were at that time settlers upon the land. But if that proposition is not correct, then the proof of settlement and causing the land to be surveyed was the inception of the title. In order to purchase the land from the state the law required three things, one of which must have been an existing fact when the law went into effect, and the other two were to be subsequently performed by the purchaser, and these were: (1) That the purchaser should be an actual settler upon the land at the time the law went into effect; (2) that he have the land surveyed, etc., within a designated time; and (3) that by the time specified in the law he or his vendee should pay to the Commissioner of the Land Office 50 cents an acre for the land. This left but two things for the purchaser or his vendee to do, and one of these things, viz., having the land surveyed, etc., had been done in this case within the time required by the statute and before Stiles purchased. This was partial performance on the part of the purchaser, and it operated as an acceptance on his part and an implied obligation to pay to the state 50 cents an acre for the land. This being true, his right to secure absolute title by performance of the additional obligation was fixed, and it was a right which constituted an equitable title to the land. It was what the court designated an "incomplete equitable title" in the Creamer Case.

In Simpson v. Oats, 102 Tex. 188, 114 S. W. 106, quoted from in the last majority opinion, the quotation is followed by this language: "The present case is distinguishable from Creamer v. Briscoe, 101 Tex. 490 [109 S. W. 911, 17 L. R. A. (N. S.) 154, 130 Am. St. Rep. 869], in the fact that in that case all of the steps necessary to secure the land had been taken before the wife died except the occupancy of three years, which had been commenced and only required to be completed to give title. We held in that case that the land was the community property of the deceased wife and her husband. The very things—survey and return of field notes—which determined in that case that the property was community are absent in this, and their absence determines that the land was not community property of J. W. and Hannah Ripley." The statute construed in that case merely allowed actual settlers 12 months from the passage of the act in which to take the necessary steps to secure the land as a homestead. And as the homestead law required the land to be surveyed and the field notes returned and three years' occupancy thereafter, the Supreme Court held that oc-

cupancy, without a survey and return of the field notes, created no right.

The case of Barbet v. Langlois, 5 La. Ann. 215, quoted from by Mr. Justice Jenkins, does not militate against my position in this case. That case is quoted from by Chief Justice Gaines in Welder v. Lambert, and our Supreme Court very properly gave weight to it because it related to a provision of the Code of that state, which declared that all property acquired by purchase during coverture was community property. In that case, as well as in most of the Texas cases on the subject, the court was called on to decide whether the property belonged to the community or to the separate estate of the original purchaser, while in the case at bar the question is whether or not the property was community or separate property of a vendee of the original purchaser. However, if the Rawlses had not sold to Stiles, and had perfected their titles by paying to the state the purchase money, whether or not the lands would have been separate or community property between themselves and their wives would not, in my opinion, have depended upon whether the purchase money was paid with separate or community funds, and the Louisiana case referred to supports that view. In that case Langlois owned a tract of land fronting on a bayou. After he acquired it and in the year 1818, he married, and in 1822, during his coverture, he purchased from the government, by virtue of his right of preference, the lands lying in the rear of his tract. By the act of 1811, every person in Louisiana who owned a tract of land bordering on a river, creek, bayou, or water course was entitled to a preference in becoming the purchaser of the vacant land adjacent to and back of his own tract to a depth of 40 arpents. That law seems to have been limited by its terms to three years; but it was revived or re-enacted in 1820, and was in force when Langlois made his second purchase. It does not appear that he had the land surveyed or took any steps whatever looking to its acquisition until after his marriage. Nevertheless, the court held that because the renewing statute of 1820 was a fulfillment of the reasonable expectation of those who had acquired lands bordering on rivers, etc., and was intended to relieve from the consequences of omissions to purchase additional lands while the act of 1811 was in force, therefore Langlois' title must be considered as originating before his marriage. The decision in that case goes further than any decision in this state in holding that property acquired after marriage is separate property, because in that case no steps were taken to purchase the land until after the marriage, and the law under which it was purchased was not enacted until after the marriage. But in so far as this case is concerned, the pith of the decision is that the law was enacted for the benefit of a certain class of persons, and the court held that because Langlois became one of that class of persons before his marriage, therefore his purchase after his marriage would relate back and fix the status of the property as belonging to his separate estate.

The second section of the act of August 26, 1856, involved in this case was enacted for the benefit of a certain class of persons described therein as actual settlers at the time the law went into effect; and if the Louisiana case is sound, it is certainly permissible to go back to the time the law went into effect and ascertain whether the settler was a married or single man in determining whether or not such land would belong to the community or to his separate estate. In fact the Louisiana case would seem to justify going back to the time when the settlement was made.

But, as stated before, the question in this case is not whether J. T. and W. W. Rawls' title was community or separate property, but the question is whether or not they had an equitable title to the land when they conveyed the same in January, 1858. If they had such title—whether separate or community property—such title was vested in Stiles; and, although the legal title remained in the state, the title so vested in Stiles was the paramount and superior title, and his acquisition of it should be considered the inception of his title, and, as he was then a single man, the land became his separate property.

In view of the authorities which have been cited in support of my views, and after giving to the case the best thought of which I am capable, I feel quite sure that it ought to be held that when the Rawlses accepted the terms of the act of August 26, 1856, by making proof of their settlement, procuring an official survey, etc., they had as much right to the land as a pre-emptor had when he had settled upon, had the land surveyed, etc., but had not resided upon it the length of time required by law in order to perfect his title; and it is well settled by the authorities, and, in effect, conceded by the last majority opinion, that such a settler has an equitable title. And in support of the proposition that the act of August 26, 1856, was a pre-emption law, I refer to Miller v. Moss, 65 Tex. 180. In that case it was shown that the land in controversy was in the Mississippi and Pacific Reservation; that Miller and his family settled upon it and improved it as early as 1855, and that they continued to occupy it until some time in 1862, when he went into the Confederate Army and died, and that since that time his family had not occupied it. On July 16, 1883, the land was patented to the heirs of Miller and they brought suit to recover it. The defendants made the contention that the patent was void because the Millers had never paid the state for the land;

but the Supreme Court held that they were not required to do so, because the act of March 24, 1871 (Laws 1871, c. 22), dispensed with the payment of any consideration if Miller and his family had occupied the land for a period of three years *under any of the pre-emption laws*, and had complied with the second section of the act of August 12, 1870 (Laws 1870, c. 53), and the court said: "That the act of August 26, 1856, was a pre-emption law its nature renders too clear, and that those claiming under it are classed as persons entitled to pre-emption is clearly shown by several statutes extending relief to persons holding under the several pre-emption laws." P. D. 4357–4362.

It seems to me that the holding of the majority of the court that at the time the Rawlses sold they had no fixed right in the land leads necessarily to the conclusion that, notwithstanding acceptance by settlers, by having their lands surveyed, still, although after such acceptance they may have made valuable improvements, the state at any time could have repealed the statute granting them the right to purchase, and ousted all who had not paid the purchase money prior to the repealing act. I deny the soundness of that proposition, and maintain that, after a settler had accepted under the statute by having the land surveyed, he had a vested right in the land. It clearly appears that J. T. and W. W. Rawls each made his proof of settlement on the 11th day of February, 1857, and that the lands were surveyed by virtue of such proof by the proper surveyor on the 2d day of April, 1857, which was about nine months before the Rawlses executed the deeds which resulted in the lands being patented to George Stiles, as assignee. As to the J. T. Rawls' survey, the deed from him, in effect, states that the field notes had been returned to the land office; but I do not consider that such return was necessary to constitute acceptance under the statute and fix his right to the land. The time had not then expired for such return to be made; and the proof of settlement and having the land surveyed constituted acceptance of the state's offer, and created a contract to purchase the land, binding upon both the state and Rawls.

For the reasons stated, I renew my dissent.